Per Curiam
: In this suit for unpaid portions of operating-differential subsidy allegedly due the plaintiff company, there is no material dispute as to the facts and both parties have moved for summary judgment. The case was referred to Trial Commissioner Mastín G. White, pursuant to Rule 37(e), for his recommendation for a conclusion of law. The Commissioner has submitted an opinion and a recommended conclusion. Defendant has sought review of that opinion and recommendation. Oral argument has been had and the briefs have been considered. The court agrees with the Commissioner’s recommendation and with his opinion, and adopts that opinion, as supplemented by the remaining portion of this opinion, as the basis for judgment in this case.
The only real controversy is whether plaintiff’s claim is barred by the six-year statute of limitations, 28 U.S.C. § 2501. To the Commissioner’s opinion on that point we add some discussion of American-Foreign Steamship Corp. v. United States, 291 F. 2d 598 (C.A. 2), cert. denied, 368 U.S. 895 (1961) — the Second Circuit “charter hire” limitations decision, on which defendant relies. That holding is quite distinguishable from the case at bar: (a) whatever may be the rule for other tribunals, for this court no cause of action accrues before the claimant can bring a suit for a money judgment;[1] (b) no such suit could be brought by plaintiff in this court prior to the beginning of the six-year period before suit was actually commenced (October 17,1962) since the Maritime Commission did not finally fix the subsidy rates until March 5, 1956, and plaintiff submitted its revised accounting (on the basis of those final rates) on October 19, 1956; (c) in the “charter hire” cases, the claimants made *219 alleged overpayments, from time to time, which, they could have sued to recover and they also paid monies admittedly owed to the Government which they could have withheld, whereas here plaintiff made no such payments prior to the six-year period before suit; and, finally, (d) in the present case there was no provision of the subsidy contract which could be read as accelerating the claim, while the charters involved in the Second Circuit case contained a clause IB which some members of the court construed as having that effect.
Defendant’s motion for summary judgment is denied and plaintiff’s cross-motion for summary judgment is granted. The plaintiff is entitled to recover and judgment is entered for the plaintiff in the sum of eighty-seven thousand five hundred sixty-four dollars and fifty-two cents ($87,564.52).
OPINION OE COMMISSIONER
The plaintiff, The Oceanic Steamship Company, claims in the present case that the United States has failed to pay the full amount of the operating-differential subsidy due the plaintiff for the year 1947. The case is presented to the court on the defendant’s motion and plaintiff’s cross-motion for summary judgment.
It appears from an examination of the motions that the parties are in substantial agreement respecting all the material issues of fact and law that are involved in the case, with the exception of the question whether the plaintiff’s claim first accrued within the 6-year period immediately preceding the filing of the petition on October 17,1962. This question is crucial, because it is provided in 28 US.C. § 2501 (1958) that:
Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
The plaintiff is a California corporation. During the period that is involved in this litigation, the plaintiff was engaged in the operation of shipping services over a Pacific trade route between California and Australasia. On December 27,1937, the plaintiff and the United States Maritime Commission entered into a contract (No. MCo-9) for the *220 payment to the plaintiff of an operating-differential subsidy under Section 603 of the Merchant Marine Act, 1936 (49 Stat. 1985, 2002). The contract was to cover the 5-year period beginning January 1, 1938, and terminating on December 31,1942.
Section 603 of the Merchant Marine Act, 1936, authorized the making by the Maritime Commission of contracts with citizens of the United States engaged in the operation under United States registry of vessels in foreign commerce. Such a contract provided for the payment to the carrier of an operating-differential subsidy covering the difference between the carrier’s reasonable costs for certain items of expense and the estimated fair and reasonable costs that would be incurred for the same items of expense if the carrier’s vessels were operated under foreign registry.[2]
Lest the operations of subsidized carriers be excessively profitable, Section 606(5) of the Merchant Marine Act, 1936 (49 Stat. at p. 2004), provided that if the net profit of a subsidized carrier at the end of any 5-year period “has exceeded 10 per centum per annum upon the contractor’s capital investment necessarily employed in the operation of the subsidized vessels, * * * the( contractor shall pay to the United States an amount equal to one-half of such profits in excess of 10 per centum per annum as partial or complete reimbursement for operating-differential-subsidy payments received by the contractor * * An amendment of Section 606(5) that was made by Section 22 of the Act of June 23,1938 (52 Stat. 953, 960), substituted a 10-year “recapture” period for the 5-year period specified in the original legislation.
The Maritime Commission was authorized by Section 607 (d) of the Merchant Marine Act, 1936 (49 Stat. at p. 2006), to define by regulation the term “capital necessarily employed” in the business of a subsidized carrier. In the absence of a regulation covering this point at the time when *221 contract MCc-9 was entered into on December 27, 1937, the Maritime Commission and the plaintiff incorporated in the contract, as Article 37(b), a provision which defined “capital necessarily employed” in terms substantially equivalent to net worth, i.e., the excess of assets over liabilities. Subsequently, on June 11,1940, the Maritime Commission promulgated a regulation, General Order No. 31, which defined “capital necessarily employed” in terms substantially equivalent to net worth. This definition was incorporated in contract MCc-9 by addendum No. 16.
At the beginning of World' War II, the Maritime Commission had operating-differential subsidy contracts with 12 American-flag operators, including the plaintiff. All the vessels of these operators were requisitioned by the United States early in the war period, and no operating-differential subsidy was paid during that period. However, the existing subsidy contracts were kept alive by the conditional extension of their termination dates, so that subsidized operations could be resumed after the end of the war.
Following the end of World War II, the Maritime Commission authorized the resumption of subsidized operations on January 1,1947, by the 12 carriers previously mentioned. However, this authorization was provisional in nature, since the operators were notified that they must agree to the incorporation in their respective contracts of addenda setting out such conditions as the Commission might subsequently impose. The plaintiff indicated its concurrence in this arrangement by means of a letter dated December 24, 1946.
The plaintiff actually commenced its commercial postwar operations prior to January 1, 1947. With the resumption of subsidized operations on that date, the plaintiff thereafter conducted its business in conformity with the requirements fixed by the Maritime Commission. The plaintiff submitted sailing schedules each month, and they were duly examined and approved by the Commission. No subsidy was paid to the plaintiff, however, pending the formal execution of a resumption addendum to contract MCc-9.
Various complications and differences between the plaintiff and the Maritime Commission prevented them from reaching an agreement on the terms of a formal document *222 covering the resumption of subsidized operations by tbe plaintiff. As of September 1951, the plaintiff had not received any subsidy payments on its operations during the period that had begun on January 1,1947, and the plaintiff was in serious financial straits.
In the meantime, on December 21,1949, the Maritime Commission had promulgated General Order No. 71, which prescribed a new definition of “capital necessarily employed” in the business of a subsidized operator. The new definition was more restrictive than the definition previously contained in General Order 31. This change was disadvantageous to the subsidized carriers with respect to their obligation under Section 606(5) of the Merchant Marine Act, 1936, to pay the United States one-half of their profits in excess of “10 per centum per annum upon the contractor’s capital investment necessarily employed in the operation of the subsidized vessels.”
At the time of the promulgation of General Order 71 on December 21, 1949, the Maritime Commission had not yet entered into a resumption agreement with any of the 12 subsidized operators. However, the promulgation of General Order 7l made it feasible for the Maritime Commission to enter into new agreements with several operators, as the negotiations with those operators had been completed. Five such agreements were signed in January 1950; and additional agreements were signed by the administrative agency with subsidized carriers on April 5, 1950, May 1, 1950, March 8, 1951, June 6, 1951, and August 16, 1951.[3] Each agreement was entitled an “Extended Operating-Differential Subsidy Agreement” and constituted a complete revision of the theretofore existing operating-differential subsidy contract with the particular carrier.
As of August 16, 1951, therefore, 10 of the 12 subsidized carriers had signed formal resumption agreements with the administrative agency. The two subsidized carriers that had not signed such agreements were the plaintiff and American President Lines, Ltd.
*223 While the negotiation and signing of resumption agreements were in progress, the subsidized operators, including the plaintiff and American President Lines, Ltd., were engaged in an endeavor to obtain reconsideration of General Order 71, which defined “capital necessarily employed” in a manner more restrictive than the definition previously contained in General Order 31. On July 11, 1951, the Federal Maritime Board and the Maritime Administration, successors to the Maritime Commission,[4] heard oral argument on the operators’ obj ections to General Order 71. Thereafter, the matter was under consideration by the agencies for more than a year.
On September 25, 1951, the Federal Maritime Board tendered a proposed resumption agreement to the plaintiff, and the plaintiff signed the agreement on September 28, 1951. This document was a replacement for, and not an addendum to, contract MCo-9 dated December 27, 1937, as extended. The new agreement was denominated an “Extended Operating-Differential Subsidy Agreement,” and was assigned the contract number FMB-14. It applied retroactively to the period from January 1,1947, to the date of signing, and it was to extend prospectively until December 31, 1955.[5] Contract FMB-14 included, as Article I-13'(c), a special provision to the effect that:
* * * [T]he operator agrees to accept any changes by the United States in the definition of the term “Capital Necessarily Employed in the Business” as set forth in General Order 71 of the Commission, including without limitation of the foregoing, changes with respect to the effective date of said definition.
On October 5, 1951, the American President Lines, Ltd., signed a resumption agreement similar to the one signed by the plaintiff.
About a year later, on September 17, 1952, the Federal Maritime Board and the Maritime Administration announced their decision on the subsidized operators’ request *224 for the reconsideration of General Order 71. The effect of this decision, which was incorporated in Amendment No. 1 to General Order 71, was to divide the subsidized operators into two categories with respect to the applicability of General Order 71. For those operators who had signed their resumption agreements prior to May 1,1951, General Order 71 was to apply only to periods following the termination of their 10-year “recapture” periods current on December 31, 1946. This meant that, as to the operators in this category, General Order 71 would not be applicable earlier than January 1,1948, in any instance, and that the less restrictive provisions of General Order 31 would apply to the 1947 operations of these carriers. On the other hand, for the operators whose resumption agreements were signed after April 30, 1951 — i.e., the plaintiff and American President Lines, Ltd.[6] — General Order 71 was to be effective as of January 1, 1947.
The American President Lines, Ltd., instituted an action in this court on September 16,1958, for the recovery of subsidy allegedly due for the year 1947 and unpaid because of the application of General Order 71 to the 1947 operations of American President Lines, Ltd., under Amendment No. 1 to General Order 71. In a decision dated July 19, 1961, 154 Ot. Cl. 695, 291 F. 2d 931, the court held that American President Lines, Ltd., was entitled to recover. The court said (at p. 705, 291 F. 2d at 936) that the “unjustified discrimination and unreasonable retroactivity invalidated the Maritime Board’s attempted rollback of the effective date of the definition of ‘capital necessarily employed’, embodied in General Order No. 71.”
The plaintiff’s claim in the present case is basically similar to the claim of American President Lines, Ltd., referred to in the preceding paragraph. Therefore, the principle announced by this court in disposing of the claim asserted by American President Lines, Ltd., is equally applicable to the plaintiff’s claim in the present case; and it is clear that the administrative agencies acted unlawfully in discriminating against the plaintiff by applying General Order 71 to the *225 plaintiff’s operations for the year 1947, while applying the less restrictive provisions of General Order 31 to the 1947 operations of other subsidized carriers.
This leaves for consideration by the court in the present case the question as to when the plaintiff’s claim first accrued, and specifically whether it first accrued within the 6-year period immediately preceding the filing of the petition on October 17, 1962.
A claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action. Empire Institute of Tailoring, Inc. v. United States, 142 Ct. Cl. 165, 167 (1958), 161 F. Supp. 409, 410; Cosmopolitan Manufacturing Co. v. United States, 156 Ct. Cl. 142, 297 F. 2d 546,547 (1962).[7] Therefore, where a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract. Smith Courtney Co. v. United States, 46 Ct. Cl. 262, 265-266 (1911); Cannon v. United States, 137 Ct. Cl. 104, 107 (1956), 146 F. Supp. 827, 829. Of course, in determining when money becomes due and payable under a contract, it is necessary to ascertain the nature of the agreement that the parties have made on this point. Manufacturers Aircraft Association, Inc. v. United States, 77 Ct. Cl. 481, 522 (1933); Austin Engineering Co., Inc. v. United States, 88 Ct. Cl. 559, 562 (1939).
It is necessary, therefore, to consider the provisions of contract FMB-14 in order to determine when the operating-differential subsidy for the calendar year 1947 became due and payable. Article 11-24 of the contract provided in part as follows with respect to this point:
Annual Accounting and Adjustments. There shall be a final accounting hereunder between the Operator and the Commission as soon as practicable after the end of each calendar year * * *.
(a) If, at the time of such annual accounting, there remains unpaid subsidy accrued hereunder * * * with *226 respect to operations after December 81,1946, during the then current recapture period in excess of any amount of the recapture accrual required by law to be withheld by the Commission, the Commission shall then fay the amount of such excess to the Operator. (Emphasis supplied.)
It appears, therefore, that the net amount of the operating-differential subsidy for a particular calendar year became due and payable only after a “final accounting” for the year had been accomplished between the plaintiff and the administrative agency, and that such an accounting involved not only the computation of the amount of the subsidy due the plaintiff from the Government for the year under Section 603 of the Merchant Marine Act, 1936, but also the computation of the amount due from the plaintiff to the Government under the “recapture” provisions of Section 606(5) of the Act, and the striking of a balance between the two amounts. Such a “final accounting” was to be accomplished “as soon as practicable after the end of each calendar year.”
It was obviously not “practicable” for the parties to have a “final accounting” for the year 1947 — the one that is involved in the present litigation — “soon” after the end of that year, since contract FMB-14 was not entered into by the parties until September 28, 1951, and it was then made applicable retroactively to the plaintiff’s operations for the year 1947. Furthermore, it was not “practicable” to have a “final accounting” for the year 1947 “soon” after contract FMB-14 was signed. The original contract merely provided in general terms (Article 1-4) for the payment to the plaintiff of “sums not exceeding the excess of the fair and reasonable cost of insurance, maintenance, repairs not compensated by insurance, wages and subsistence of officers and crews, and any other items of expense in which the United States shall find and determine that the Operator is at a substantial disadvantage in competition with [foreign registry] vessels * * *, over the estimated fair and reasonable cost of the same item of expense * * * if such vessel were operated under the registry of a foreign country whose vessels are substantial competitors of the vessels covered by this agreement.” As of the time when contract FMB-14 was entered into on September 28,1951, no determinations had been made *227 by the Government with respect to the differential rates that should apply to the items of expense mentioned in the contract. It was contemplated that such determinations would be made subsequently; and, accordingly, the contract provided (in Article 1-5) that “When any rates are determined by the United States with respect to subsidizable items of expense, * * * the same may be added by addendum * *
It was not until August 27,1952, that the first subsidy rate under contract FMB-14 was determined by the United States and added to the contract by an addendum. This addendum specified the percentages of the wages paid by the plaintiff to officers and crews that would be payable as subsidy under contract FMB-14. Additional subsidy rates for other items of expense were determined by the Government and added as addenda to contract FMB-14 on February 5, 1953 (subsistence, maintenance, and repairs not compensated by insurance), on June 8, 1953 (voyage stores, supplies, and expendable equipment), on April 2,1954 (hull and machinery insurance), and on March 5,1956 (protection and indemnity insurance). Hence, it was not until March 5,1956, that the last subsidy rate was determined by the Government and added by addendum to contract FMB-14; and that determination was applicable retroactively to the plaintiff’s operations for the year 1947, as well as to the other years covered by contract FMB-14.
Contract FMB-14 permitted the plaintiff, with the acquiescence of the administrative agency, to collect partial payments on account while the Government went through the lengthy process of determining subsidy rates and adding them to contract FMB-14 by means of addenda. This was covered by Article 11-23 of the contract, which provided in part as follows:
Payments on Aoooimt. * * * [PJayments on account may in the discretion of the Commission be made after the end of each quarter-annual period with respect to voyages terminating during such period * * * and upon such special conditions as the Commission may determine. Such payments * * * shall not exceed in the aggregate 75 per centum of the amount then estimated to have accrued to the Operator on account of operations under this agreement during such year, except that with *228 respect to that part of the subsidy relating to voyages terminating during any particular quarter-annual period, an additional 15 per centum may, at the option of the Commission, be paid after the Operator’s audit of the voyage accounts for such voyages has been completed and the Commission’s auditors have verified the correctness of the same * * *.
In accordance with the contract provision for the making of partial subsidy payments to the plaintiff, and on the same date (August 27, 1952) when the Government fixed the subsidy rate with respect to the wages of officers and crews, the plaintiff submitted a voucher for a partial subsidy payment covering 75 percent of the amount computed to be due for the year 1947 as the subsidy on wages. Such a partial payment in the amount of $89,238.74 was made to the plaintiff on October 22, 1952. The plaintiff on October 15, 1952, submitted another request for a partial payment respecting the year 1947; it covered 75 percent of the amount computed to be due as the subsidy on the expense items of subsistence and repairs; and it was paid by the Government on March 19, 1953, in the amount of $17,846.96. The plaintiff’s next request for a partial payment relative to the year 1947 was dated July 20, 1953; it covered 90 percent of the amount computed to be due as the subsidy on wages, subsistence, and repairs (less the 75-percent payments previously received respecting these items of expense); and it was paid sometime during the period August-September 1953 [8] in the amount of $8,843.39. The plaintiff’s fourth and last request for a partial payment relative to the year 1947 was dated March 22,1956; it covered 90 percent of the amount computed to be due as the subsidy on insurance premiums; and it was paid sometime during April 1956[9] in the amount of $20,557.80. The plaintiff’s last request for a partial payment was submitted less than a month after the Government completed the process of fixing subsidy rates under contract FMB-14 by adding to the contract an addendum relating to the subsidy rate on protection and indemnity insurance pre *229 miums. Later, as the Government was of the opinion that the partial payments received by the plaintiff were in excess of the aggregate amount of the partial payments to which the plaintiff was entitled under Article 11-23 of contract FMB-14, the plaintiff refunded to the Government, on demand, the sum of $11,851.86.
In the meantime, pursuant to the pertinent administrative regulations, the plaintiff on October 23, 1953, submitted what was denominated a “final accounting” for the year 1947. The plaintiff’s data were audited by the Government during the period between October 23, 1953, and June 11, 1954.[10] Subsequently, after the Government completed on March 5, 1956, the process of fixing subsidy rates under contract FMB-14, the plaintiff on October 19,1956, submitted a “revised annual accounting” for the calendar year 1947. The “revised annual accounting” was audited by the Government, and the plaintiff was informed as to the audit results on October 18, 1957. Thereafter, the Government on or about November 25, 1957, made a final subsidy payment in the amount of $13,848.34 to the plaintiff with respect to the calendar year 1947 under contract FMB-14.
With the receipt on or about November 25, 1957, of the $13,848.34 mentioned in the preceding paragraph, the plaintiff had received a net total of $138,483.57 as operating-differential subsidy for the year 1947 under Section 603 of the Merchant Marine Act, 1936, after the amount purportedly due the United States under the “recapture” provisions of Section 606(5) of the Act had been set off against the subsidy. In computing the amount of the setoff, the Government applied General Order 71 to the plaintiff’s operations for the year 1947. This was discriminatory and erroneous, as indicated earlier in the opinion. The plaintiff’s treatment should have been similar to that accorded other subsidized operators, and the less restrictive General Order 31, instead of General Order 71, should have been applied to the 1947 operations of the plaintiff. If this had been done, it appears from the data in the record that the net operating differential subsidy payable to the plaintiff for the year 1947 would *230 have been. $87,564.52 more than the net amount ($188,483.57) which the plaintiff actually received. The plaintiff sues in the present case for the $87,564.52 difference; and it is entitled to recover unless the claim is barred by the 6-year statute of limitations.
We have previously noted that, under Article 11-24 of contract FMB-14, the Government was obligated to pay the net amount due the plaintiff as operating-differential subsidy for any year after — and only after — a “final accounting” for the particular year had been accomplished between the plaintiff and the Government. Therefore, the plaintiff could not institute an action respecting the subsidy for 1947 — and the 6-year statute of limitations as to such a claim did not start to run — until after the completion of the “final accounting” for 1947.
With respect to this point, the defendant apparently believes that the submission and auditing of the plaintiff’s so-called “final accounting” dated October 23, 1953, constituted for 1947 the “final accounting” contemplated by Article 11-24 of contract FMB-14; and that since the procedure in question was completed in 1954, or more than 6 years prior to the filing of the petition on October 17, 1962, the plaintiff’s claim is necessarily barred by the 6-year statute of limitations. It seems to me that such a position is untenable. Irrespective of what the plaintiff’s submission of October 23,1953, was termed, it could not have been part of the “final accounting” for the year 1947 contemplated by Article 11-24 of contract FMB-14. At the time of that submission, the Government had not completed the process of fixing subsidy rates with respect to all the items of expense specifically named in Article 1-4 of the contract as sub-sidizable. Although rates had been fixed as of October 23, 1953, with respect to wages, subsistence, maintenance, and repairs, the Government had not yet fixed a subsidy rate for insurance, and it was under a contractual obligation to fix a rate and pay subsidy on this item of expense. Obviously, a true “final accounting” between the plaintiff and the Government for the year 1947 (or any other year) could not be accomplished until after the subsidy rates had been fixed by the Government for all the items of expense specifically *231 named as subsidizable in Article 1-4 of tbe contract. Therefore, as a practical matter, tbe actual “final accounting” of tbe parties for the year 1947 had to 'be postponed until sometime after tbe fixing of tbe subsidy date for insurance, and this process was not completed until March 5,1956.
It has been mentioned previously that tbe plaintiff on October 19, 1956, submitted a “revised annual accounting” for tbe year 1947; that tbe data in this submission were audited by tbe Government during the period between October 19,1956, and October 18,1957; and that the Government thereafter made a final subsidy payment for tbe year 1947 to tbe plaintiff on or about November 25,1957. It was this procedure during 1956 and 1957 that was tbe actual “final accounting” between tbe parties for tbe year 1947 under contract FMB-14. Since it appears that tbe plaintiff acted without undue delay after March 5,1956, in instituting on October 19,1956, the final accounting procedure for 1947, and since this procedure between tbe parties was completed within tbe 6-year period immediately preceding tbe filing of tbe petition on October 17,1962, it is my opinion that tbe plaintiff’s claim for additional 1947 subsidy first accrued within such 6-year period, and, therefore, that tbe claim is not barred by tbe statute of limitations.
For tbe reasons previously indicated, I recommend that tbe defendant’s motion for summary judgment be denied, that the plaintiff’s cross-motion for summary judgment be allowed, and that judgment be entered for tbe plaintiff in tbe sum of $87,564.52.

 Cf. American President Lines, Ltd. v. Federal Maritime Board, 133 F. Supp. 100, 103 (D.D.C., 1955), aff’d per curiam, 235 F. 2d 18 (C.A.D.C., 1956).

 The present provisions of Section 603, as amended, are found In 46 U.S.C. § 1173 (1958, Supp. IV). The authority to malee contracts on behalf of the united States under this section was transferred from the Maritime Commission to the Federal Maritime Board by Section 105(1) of Reorganization Plan No. 21 of 1950 (15 F.R. 3178, 3179), and thereafter was transferred from the Board to the Secretary of Commerce by Section 202(b)(1) of Reorganization Plan No. 7 of 1961 (26 F.R. 7315, 7316).

 In connection -with the signing of the resumption agreements on June 6 and August 16, 1951, the two operators involved in those agreements waived subsidy payments for the year 1947.

 This change was made by Reorganization Plan No. 21 of 1950 (15 F.R. 3178).

 Contract FMB-14 was replaced as of January 1, 1956, by a new contract numbered FMB-44. The latter contract is not involved in the present litigation.

 Two other operators signed resumption agreements after April 30, 1951, hut they waived subsidy payments for the year 1947 (see footnote 2).

 Certiorari was denied (371 U.S. 818) in the ease of Arlene Coats v. United States, which involved the same legal issue as Cosmopolitan Manufacturing Go. v. United States, and was disposed of by this court in the same opinion.

 One affidavit in the record indicates that this payment was made on August 13, 1953, and another affidavit indicates that it was made on September 21, 1953.

 One affidavit states that this voucher was paid on April 25, 1956, and another affidavit states that it was paid on April 30, 1956.

 There is a dispute between the parties as to whether the plaintiff was notified regarding the results of the 1953 — 1954 audit. However, this controversy does not seem to relate to a material issue.