Mary N. CELENTANO, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

No. 97–259C.

United States Court of Federal Claims.

Aug. 26, 1998.

Carl A.S. Coan, III, Coan & Lyons, Washington, DC, attorney of record for plaintiffs.

Carl A.S. Coan, Jr., Coan & Lyons, Washington, DC, of counsel.

John E. Kosloske, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant. Dennis Murakami, Office of Assistant General Counsel for New England, Department of Housing and Urban Development, Boston, MA, of counsel.

## OPINION

HORN, Judge.

## BACKGROUND

Plaintiff is Mary N. Celentano as the original owner of Beaver Brook Apartments, and Mary N. Celentano as the trustee of Beaver Brook Apartments Associates, which is a Florida partnership and the current owner of Beaver Brook Apartments as successor in interest to Mary N. Celentano. The defendant is the Department of Housing and Urban Development (HUD), an agency of the United States.

Plaintiff brought this action to recover damages arising from the refusal by the United States to permit plaintiff to prepay the mortgage into which Mary N. Celentano had entered for the purpose of financing the development and construction of Beaver Brook Apartments, a 172 unit multifamily rental housing project for low-income and moderate-income tenants in Ansonia, Connecticut. Plaintiff alleges that her right to prepay the mortgage derives from contracts entered into between Ms. Celentano and the Department of Housing and Urban Development. As a result of the enactment of legislation that limited plaintiff's right to prepay, plaintiff claims that defendant has breached its contract with plaintiff. Further, plaintiff

claims that defendant's actions constitute a taking without the payment of just compensation in violation of the Fifth Amendment to the United States Constitution. Plaintiff seeks damages of not less than $4 million.

Defendant moves to dismiss plaintiff's breach of contract claim for lack of subject matter jurisdiction, contending that the statute of limitations had expired before the commencement of this suit.

## FACTS

### A. Statutory and Regulatory Background

In 1934, Congress enacted the National Housing Act (NHA) "[t]o encourage improvement in housing standards and conditions, to provide a system of mutual mortgage insurance, and for other purposes." Ch. 847, preamble, 48 Stat. 1246 (1934). Under the NHA, Congress authorized the creation of the Federal Housing Administration (FHA) and established a national housing program supported by federal mortgage insurance. The NHA has been amended frequently. During the 1950's and 1960's, Congress amended the NHA to encourage private developers to construct, own, and manage housing projects for low- and moderate-income families. To implement that legislation, Congress authorized first the FHA and later HUD [1] to provide mortgage insurance to enable private lending institutions to provide low-interest mortgages to housing developers.

### 1. Section 221(d)(3) Mortgage Insurance Program

Section 221 of the NHA, as amended, was enacted for the purpose of "assist[ing] private industry in providing housing for low and moderate income families and displaced families." 12 U.S.C. § 1715l(a) (1994).[2] Sec-

---

1. In 1965, the functions of the FHA, headed by the Federal Housing Commissioner, were transferred to, and subsumed by, HUD, which is headed by the Secretary of Housing and Urban Development. *See* 42 U.S.C. § 3534(a) (1994); 24 C.F.R. § 200.1–200.4 (1996).

2. As originally enacted in 1954, section 221 was designed to "supplement" other NHA mortgage insurance programs "in order to assist in relocat-

ing families to be displaced" as a result of specified kinds of governmental action. Ch. 649, title I, 123, 68 Stat. 599–600. Initially, to be eligible for mortgage insurance under section 221(d)(3), a mortgagor was required to be "a private nonprofit corporation or association or other acceptable private nonprofit organization." *Id.* at 123, 68 Stat. at 601. In 1961, the purpose of section 221 was broadened to provide assistance to pri-

tion 221 authorized HUD to insure mortgages for multifamily housing projects, including advances during construction "upon such terms and conditions as [HUD] may prescribe," and "to make commitments for the insurance of such mortgages prior to the date of their execution or disbursement thereon." *Id.* at § 1715*l*(b).

With respect to the prepayment of mortgage loans insured under section 221(d)(3) of the NHA, HUD regulations in effect at the time plaintiff's Note, Mortgage and Regulatory Agreement were executed in October 1968 gave loanholders the unilateral right to prepay the mortgage 20 years from the date of final endorsement of the mortgage. 24 C.F.R. § 221 (1978). These HUD regulations provided, in pertinent part:

> (a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner in the following cases: ... (ii) Where the mortgagor is a limited distribution type, which is not receiving payments from the Commissioner under rent supplement contract executed pursuant to the provisions of §§ 5.1 *et seq.* of this title, and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage.

24 C.F.R. § 221.524(a) (1978).

The prepayment regulations also contained a provision concerning the effect of amendments to the regulations appearing in that subpart:

> 221.749 *Effect of Amendments*
>
> The regulations in this subpart [24 C.F.R. Part 221, Subpart C] may be amended by the Commissioner at any time and from time to time, in whole or in part, but such amendment shall not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured. and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be

insured on which the Commissioner has made a commitment to insure.

24 C.F.R. § 221.749 (1978).

*2. Emergency Low Income Housing Preservation Act of 1987 (ELIHPA)*

ELIHPA, enacted February 5, 1 988, placed restrictions upon the ability of an owner of "eligible low income housing" to prepay the HUD-insured mortgage, and as a result, remove a project from the Section 221(d)(3) housing program. 101 Stat. 1877. ELIHPA provided that an owner of "eligible low income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by the Secretary of Housing and Urban Development...." *Id.* at § 221(a), 101 Stat. 1878–79. For purposes of ELIHPA, the term "eligible low income housing" included "housing financed by a loan or mortgage" that is insured or held by HUD, and that "under regulation or contract in effect before the date of enactment of [ELIHPA], is or will within 1 year become eligible for prepayment without prior approval of the Secretary." ELIHPA at § 233(1), 101 Stat. 1885.

Under ELIHPA, an owner of eligible low-income housing seeking to initiate prepayment was required to file with HUD a "notice of intent" and, after receiving certain information from HUD, a "plan of action." *Id.* at §§ 222, 223, 101 Stat. 1879. Before approving a plan of action that involved termination of the low income affordability restrictions, ELIHPA required that HUD make a written finding that—

> (1) implementation of the plan of action will not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and
>
> (2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—
>
> > (i) the availability of decent, safe, and sanitary housing affordable to lower in-

vate industry in furnishing housing for "low and moderate income families," as well as "families displaced from urban renewal areas, or as a result of governmental action." Pub.L. No. 87–70, 101(a)(2), 75 Stat. 149.

come and very low-income families or persons in the area that the housing could reasonably be expected to serve;

  (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

  (iii) the housing opportunities of minorities in the community within which the housing is located; or

(B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.

*Id.* at § 225(a), 101 Stat. 1880.

ELIHPA also contained a provision by which portions of ELIHPA would sunset two years after its enactment, or on February 5, 1990. *Id.* at § 203(a), 101 Stat. 1878. The expiration date of ELIHPA was extended three times. ELIHPA eventually expired on November 28, 1990.

### 3. Low–Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA)

On November 28, 1990, Congress enacted LIHPRHA which continued the ELIHPA restrictions upon the prepayment of mortgages. 104 Stat. 4249. LIHPRHA provided that "[a]n owner of eligible low-income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such housing only in accordance with a plan of action approved by the Secretary under [LIHPRHA] or in accordance with [12 U.S.C. § 4114]." 12 U.S.C. § 4101(a) (1994). LIHPRHA further provided that "[a]ny prepayment of a mortgage on eligible low-income housing or termination of the mortgage insurance on such housing not in compliance with the provisions of [LIHPRHA] shall be null and void and any low-income affordability restrictions on the housing shall continue to apply to the housing." *Id.* at § 4101(c). For purposes of LIHPRHA, the term "eligible low-income housing" included "housing financed by a loan or mortgage" that is "in-

sured or held by the Secretary and bears interest at a rate determined under the proviso of [12 U.S.C. § 1715*l*(d)(5) and that] under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Secretary." *Id.* at § 4119(1).

Under LIHPRHA, an owner of eligible low-income housing desiring to prepay the mortgage was required to file with HUD a notice of such intent. 12 U.S.C. § 4102(a) (1994). Before approving a plan of action that involved termination of the low-income affordability restrictions through prepayment of the mortgage, LIHPRHA required that HUD make a written finding that implementation of the plan of action would not "materially increase economic hardship for current tenants, "or" involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available." 12 U.S.C. § 4108(a)(1)(A), (B) (1994). HUD also had to make a finding that—

  (2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

  (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

  (B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

  (C) the housing opportunities of minorities in the community within which the housing is located.

*Id.* at § 4108(a). If HUD could not make all of these required findings, LIHPRHA required that a plan of action to prepay a mortgage be disapproved and provided that the related notice of intent would not have any effect. *Id.* at § 4108(c).

### B. Statement of Facts

Plaintiff Celentano advises that Beaver Brook was constructed with a below-market interest rate mortgage loan insured by HUD

under section 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(3) (1994). In that regard, on or about September 10, 1968, HUD issued a "Commitment For Insurance of Advances" (Commitment) to the New Haven Savings Bank for Beaver Brook (FHA Project No. 017–55095). The Commitment stated that the Federal Housing Commissioner, acting on behalf of the Secretary of Housing and Urban Development, would endorse for insurance a loan with a below-market interest rate to be secured by a mortgage, as provided under Section 221(d)(3) of the NHA and HUD's implementing regulations. Specifically, the loan would bear interest at the rate of 6.75 per cent per annum "up to and including the date of final endorsement of the secured note," and thereafter, the loan would "bear interest at the rate of 3.00 per cent per annum," repayable over a term of 40 years.

On or about October 15, 1968, Mary N. Celentano executed a "Mortgage," "Secured Note," and "Regulatory Agreement" for Beaver Brook. The secured note provided, in pertinent part, that "[t]he debt evidenced by this note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner." The Commissioner endorsed the Beaver Brook note for insurance on May 11, 1970.

Celentano entered into a Regulatory Agreement with and for the benefit of HUD for the purpose of specifying the manner in which Beaver Brook would be operated. By its terms, the Regulatory Agreement was to remain in effect only during the time HUD was obligated to insure the mortgage. By executing the Note and Regulatory Agreement, Celentano promised to construct and maintain housing in accordance with HUD specifications, to accept only low- or moderate-income persons as tenants, to charge rents no higher than those permitted by HUD, to distribute profits to the owner in accordance with specified limitations, to make timely payments on the mortgage, and to maintain certain cash reserves.

Celentano alleges that HUD "agreed" to "allow Celentano to prepay the mortgage and free herself of HUD's regulatory structure after the first 20 years." After that time, Celentano argues she should have been able to convert Beaver Brook to "a conventional, market-rent project." Celentano further alleges that the enactment of ELIHPA and then of LIHPRHA prevented her from prepaying the HUD-insured mortgage loan on May 11, 1990, *i.e.*, 20 years after HUD's final endorsement of the loan for insurance. According to Celentano, "[b]ut for the action of Defendant, [she] would have prepaid the [secured note] and/or canceled the mortgage insurance and Regulatory Agreement in accordance with the contracts on or after the twentieth anniversary of the date of HUD's final endorsement." Celentano argues that, "as a private property owner, [she] had an economically viable interest taken for public use by being prohibit[ed] from exercising [her] vested and exclusive possessory right to deal with [her] property freely and without federal control of any nature." Celentano further alleges that, "[b]y virtue of Defendant's actions, [she has] suffered economic loss during the time [she] continued to be burdened by federal regulatory control...."

According to Celentano, subsequently, on February 1, 1997, as a result of the enactment of the Department of Veteran Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, Pub.L. No. 104–204, 110 Stat. 2874 (1996), she prepaid the Beaver Brook mortgage, thereby terminating the low-income affordability restrictions imposed by the Regulatory Agreement upon the project. This legislation restored plaintiffs' right to prepay the mortgage at any time after the 20th anniversary of the date of HUD's final endorsement of the note.

### DISCUSSION

When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch.*

*Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

■ In order for this court to have jurisdiction over the plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended, 28 U.S.C.A. § 1491 (West Supp. 1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed. Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan,* 424 U.S. at

400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

Defendant moves to dismiss plaintiff's breach of contract claim included in Count One of the complaint for lack of subject matter jurisdiction. Defendant contends that, for the purposes of the statute of limitations, plaintiff's claim first accrued on May 11, 1990, the first day plaintiff could exercise her right to prepay the mortgage. Plaintiff brought this suit on April 7, 1997 which is more than six years after May 11, 1990. Thus, defendant claims that plaintiff failed to commence the instant suit before the statute of limitations had expired.

Plaintiff offers several arguments in an attempt to explain why the statute of limitations did not expire before she commenced the above-captioned suit. First, she contends that her claims first accrued on May 8, 1992, when the defendant issued regulations pursuant to LIHPRHA. Second, she contends, in the alternative, that her claims first accrued on November 28, 1990, when LIHPRHA was enacted and that although April 7, 1997 is more than six years after November 28, 1990, the statute of limitations did not expire on November 28, 1996 because the statute was tolled for an additional 224 days while a motion for class certification, in which plaintiff was an asserted member, was pending in *Greenbrier v. United States,* 40 Fed.Cl. 689 (1998). Third, plaintiff contends that her claim first accrued on October 22, 1990 when the defendant issued regulations to ELIHPA and that although April 7, 1997 is more than six years after October 22, 1996, the statute of limitations did not expire on October 22, 1996 also because the statute was tolled for the additional 224 days while the same motion for class certification was pending.

Fourth, plaintiff claims that the statute of limitations should be equitably tolled until November 28, 1990 when Congress enacted LIHPRHA because of the confusion and uncertainty in that law regarding the prepayment of mortgages prior to the enactment by Congress of LIHPRHA.

■ The above-captioned case is governed by the six-year statute of limitations set forth in 28 U.S.C. § 2501 (1994). The court concludes that plaintiff's takings and breach of contract claims first accrued on May 11, 1990, when plaintiff would have been eligible to prepay her mortgage but for the subsequent legislation. Generally for statute of limitations purposes, a claim accrues "when all events have occurred to fix liability of the government and entitle the claimant to institute action." *Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir.1988) (quoting *Ocean Steamship Co. v. United States,* 165 Ct.Cl. 217, 225, 1964 WL 8621 (1964)). *Accord Alliance of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994) ("a claim does not accrue until the claimant has suffered damages."); *Terteling v. United States,* 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964); *Chipps v. United States,* 19 Cl.Ct. 201, 203, *aff'd,* 915 F.2d 1585 (Fed.Cir.1990).[3]

Although the limitations period begins to run when a claimant has suffered a compensable injury, that juncture is not to be confused with the point in time at which the claimant is finally able to calculate the precise quantum of damages. *Alaska v. United States,* 32 Fed.Cl. 689, 700 (1995); *see also Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 186 (1997), *aff'd, sub nom. Ariadne Financial Servs. Property Ltd. v. United States,* 133 F.3d 874 (1998); *Jones v. United States,* 9 Cl.Ct. 292, 295 (1985), *aff'd,* 801 F.2d 1334 (Fed.Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). On May 11, 1990, plaintiff no longer had a unilateral option to

---

**3.** The statute of limitation may be tolled, however, even in suits against the government. *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988). To toll the statute of limitation, a claimant must show either "that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inher-ently unknowable' at the accrual date." *Japanese War Notes,* 373 F.2d at 359. *See also Urie v. Thompson,* 337 U.S. 163, 169–70, 69 S.Ct. 1018, 1024–25, 93 L.Ed. 1282 (1949); *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d at 1482. None of these conditions are applicable in the present case.

prepay her mortgage. At that time, the plaintiff's rights were, at least temporarily, limited and whatever compensable injury plaintiff may have suffered, she suffered at that time.

Several recent cases in this court have addressed the same type of statute of limitations calculation as is issue in the instant case. In *Anaheim Gardens v. United States,* 33 Fed.Cl. 773 (1995), the court stated that:

> The court agrees with defendant that the prepayment restrictions which are the basis of plaintiffs' breach claim were imposed in 1988 as part of ELIHPA and were effectively reenacted in 1990 as part of LIHPRHA. The contracts upon which plaintiffs wish to sue were breached once, not twice. Although LIHPRHA contained several new provisions which had not been included in the earlier legislation, none of those provisions bears directly on plaintiffs' prepayment rights.

*Id.* at 776. The *Anaheim Gardens* court also wrote, "[i]n the present case, it is doubtful that the enactment of ELIHPA in February 1988 was sufficient to satisfy the standard to toll a statute of limitations described in *Hopland [Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) ]." *Id.*

The *Anaheim Gardens* opinion continued, "[t]he court believes, therefore, that the limitation period with respect to any of the properties in this case began as of the property's 20–year anniversary date or the date of the enactment of ELIHPA, whichever is later." *Id.* at 777.

Nonetheless, in the same case, the *Anaheim Gardens* court also wrote:

> ELIHPA's prepayment restrictions were effectively a partial repudiation by Congress of its contractual obligation to perform or, in other words, to allow plaintiffs to prepay their mortgages without HUD's consent after their 20–year anniversary date.... While plaintiffs might have brought suit immediately after the enactment of ELIHPA they should not be penalized for waiting, first, until after the enactment of Congress's "permanent solution" and then until after they would have

been eligible for the benefit of the government's performance.

*Id.* at 778.

However, in a later case, the same *Anaheim Gardens* judge relies on the enactment date of ELIHPA, without qualification, as the date from which to calculate the statute of limitations when he stated: "[t]his court established in *Anaheim Gardens v. United States,* 33 Fed.Cl. 773 (1995), that breach of contract claims for the right to prepay HUD-endorsed mortgage balances accrues [sic] at the time of either enactment of ELIHPA or the property's twenty-year prepayment date, whichever is later." *Alder Terrace Inc. v. United States,* 39 Fed.Cl. 114, 120 (1997).

To further confuse the situation, in *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174 (1997), another judge of this court described the *Anaheim Gardens* decision as follows: "[t]he court ruled that the plaintiffs' claims could not have accrued until the second statute's enactment.... The court also ruled that the claims could not have accrued until plaintiffs' prepayment rights were ripe—that is, until the 20–year period prescribed by the mortgages had expired." *Id.* at 188. The *Winstar–Related Cases* judge accepted the first legislation (ELIPHA) as a temporary solution, and described the first statute as "an anticipatory repudiation because Congress could have withdrawn the moratorium when it enacted the permanent legislation [LIHPRHA]." *Id.*

Using the clearest standard articulated in *Anaheim Gardens,* with which this court agrees, Celentano's cause of action accrued on Beaver Brook's 20–year prepayment date, or May 11, 1990. In the case of a project such as Beaver Brook, regarding which the 20–year anniversary fell after the enactment of ELIHPA, a cause of action for damages for breach of contract accrued on the 20–year anniversary date. The subsequent enactment of LIHPRHA, after the 20–year anniversary payment date had passed, does not change the result. The cause of action had already accrued on the 20–year anniversary date. At that earlier point in time, the HUD loanholder suffered a potentially compensable loss, thus activating the running of the statute of limitations. See *Alaska v. United*

*States,* 32 Fed.Cl. at 700 (the limitations period begins to run when a claimant has suffered a compensable injury).

In her complaint, the plaintiff alleges that she had an unfettered contractual right to prepay the mortgage loan on the 20–year anniversary of the final endorsement of the loan, *i.e.,* on May 11, 1990. *See* 24 C.F.R. § 221.524(a)(ii) (1978). She further alleges that but for the enactment of ELIHPA, she would have prepaid the loan "on or after" May 11, 1990, and that as a result of the enactment of ELIHPA, she "suffered economic loss" during the interval between May 11, 1990 and February 1, 1997, the date upon which Ms. Celentano was allowed to prepay the Beaver Brook mortgage loan. Ms. Celentano's breach of contact claim, thus, accrued on May 11, 1990, which is to accrue more than six years before April 7, 1997, the date plaintiff commenced this suit. Accordingly, plaintiff's suit is barred by the statute of limitations.

Plaintiff's alternative theories regarding how to compute the statute of limitations calculations are also incorrect. The statute of limitations did not begin to accrue on November 28, 1990 when Congress enacted LIHPRHA as plaintiff alleges. Although plaintiff claims that the court in *Anaheim Gardens* mistakenly used ELIHPA rather that LIHPRHA in its opinion, her argument fails even based on the concluding words in *Anaheim,* which state: "the limitation period with respect to any of the properties in this case began as of the property's 20–year anniversary date *or* the date of the enactment of ELIHPA, whichever is later." *Anaheim Gardens v. United States,* 33 Fed.Cl. at 777. Plaintiff argues that unless LIHPRHA is substituted for ELIHPA in that sentence, it is inconsistent with other statements in the same opinion.[4] This court does not believe that the sentence in *Anaheim Gardens* contains a mistake because it is consistent with

precedent holding that "the statutory period begins to run when a claimant has suffered a compensable injury." *Alaska v. United States,* 32 Fed.Cl. at 700. Upon enactment of ELIHPA, plaintiff lost her option to prepay.

In *Alaska v. United States,* the court explained that, "Alaska was on notice that she had a viable cause of action on this record because all of the relevant facts which allegedly fix the liability of the government (i.e., that an export ban diminished the value of the state-owned oil) were known or knowable to her well before [the contested date as to when claims first accrued]." *Alaska v. United States,* 32 Fed.Cl. at 700. Similarly, in the present case, all of the relevant facts that fixed the liability had accrued, i.e., the enactment of ELIHPA diminished the value of the mortgage loan. It is irrelevant whether ELIHPA was temporary or permanent. The value of a mortgage loan with an unrestricted prepayment option is certainly greater than a mortgage loan without a prepayment option, even if the prepayment option could be reinstated at a later time as a result of ELIHPA's sunset provision. *See also Kinsey v. United States,* 852 F.2d 556, 557 (Fed.Cir. 1988) (a cause of action is generally said to accrue when all of the events necessary fix the alleged liability of the government have occurred and the claimant is legally entitled to bring suit). For the foregoing reasons, ELIHPA, or the 20–year anniversary date, whichever is later, marks the date the statute of limitations began to accrue. In the instant case, prior to the passage of LIHPRHA, on May 11, 1990, the 20–year anniversary prepayment date, plaintiff already was on notice of her accrued cause of action.

Plaintiff also incorrectly claims that her claim first accrued on October 22, 1990,[5] when HUD issued ELIHPA regulations, because Congress did not rely on the issuance of regulations to implement the statute. In

---

4. The two statements plaintiff contends are inconsistent are: 1) "[t]hus, plaintiffs would not have been unreasonable to have forborne litigation until after they had learned what sort of 'permanent solution' Congress would devise," and 2) "[w]hile plaintiffs might have brought suit immediately after the enactment of ELIHPA, they should not be penalized for waiting ... until after the enactment of Congress's permanent so-

lution'." *Anaheim Gardens v. United States,* 33 Fed.Cl. at 776, 778.

5. Plaintiffs' argument relies on a 224–day tolling of the statute while the motion for class certification was pending in *Greenbrier v. United States,* 40 Fed.Cl. 689 (1998).

this regard, plaintiff relies on *Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174 (1997). In that case, the plaintiffs, savings and loan institutions or "thrifts," alleged that they had entered into contracts with the government permitting them to use special accounting methods in conjunction with their acquisition of certain failing thrifts and that the new capital requirements of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), as applied to the acquiring thrifts, breached the terms of those contracts. The government contended that 26 of the 120 *Winstar–Related cases* were barred by the statute of limitations, arguing that plaintiffs' claims accrued upon the date Congress enacted FIRREA. *Id.* at 180–81. However, it appeared that the court disagreed with the government, and allowed the plaintiffs to forbear on their claims on the basis that their claims did not accrue until the effective date of the regulations issued by the Office of Thrift Supervision (OTS) which implemented FIRREA's capital requirements. *Id.* at 182–84. The court explained that insofar as the capital requirements were concerned, FIRREA was not self-executing:

> FIRREA conditioned the implementation of its new capital standards on regulations that did not take effect until four months after the statute's enactment.... Regardless of the fact that OTS was bound to follow FIRREA's terms when it issued its regulations, FIRREA itself merely communicated those terms, and the only means for application stood four months into the future. That those terms constituted an actual breach when applied to the thrifts cannot overshadow the fact that they were not so applied until the regulations took effect. FIRREA was essentially a legally binding forecast of a future breach of the forbearance agreements. Without any accompanying contractual nonperformance, FIRREA falls well within

the definition of an anticipatory repudiation.

*Id.* at 183–84. Thus, until regulations implemented FIRREA, "[its] breach was anticipatory, plaintiffs' contract claims did not ripen, and the statute of limitations was not triggered." *Id.* at 184.

By contrast, ELIHPA's prepayment restrictions were self-executing. In contrast to FIRREA's capital requirements, the effectiveness of those restrictions did not depend upon the issuance of implementing regulations. On the 20–year prepayment date, ELIHPA's effect was an immediate curtailment of the owner's alleged unrestricted contractual right to prepay the HUD-insured mortgage loan. Thus, the statute of limitations began to run on the later of the HUD loan's 20–year anniversary or when Congress enacted ELIHPA, and not when the government issued regulations implementing ELIHPA.[6]

■ Plaintiff also incorrectly applies the doctrine of equitable tolling when she contends that the running of the statute of limitations was tolled from the date the claims accrued on May 11, 1990, until the date Congress enacted LIHPRHA on November 28, 1990.[7] In support of her contention, plaintiff asserts that ELIHPA engendered "confusion and uncertainty" for the owner because ELIHPA was a "temporary measure." Further, when Congress replaced ELIHPA with LIHPRHA, it "could have withdrawn the moratorium on prepayments...." Celentano argues that until Congress enacted LIHPRHA, she was "in a state of limbo waiting for Congress to act." Celentano argues that she could not determine whether Congress would continue the temporary moratorium on prepayments imposed by ELIHPA, and if so, the exact nature of such a permanent moratorium.

Plaintiff improperly relies on *Capital Tracing, Inc. v. United States*, 63 F.3d 859, 863

---

**6.** Based on similar reasoning, plaintiff's contention that the statute of limitations began to run on May 8, 1992, when defendant issued regulations pursuant to LIHPRHA, should be dismissed. LIHPRHA, similar to ELIHPA, also was self-executing and did not rely on the issuance of implementing regulations to effectuate its terms.

**7.** Plaintiffs' argument relies on a 224–day tolling of the statute while the motion for class certification was pending in *Greenbrier v. United States*, 40 Fed.Cl. 689 (1998).

(9th Cir.1995), to support her contention that the uncertainty of the HUD loanholder's prepayment right and lack of prejudice to the government suffice to equitably toll the statute of limitations. The present case can be distinguished from *Capital Tracing* because the lack of clarity in the law in that case was with respect to the appropriate judicial procedure by which to litigate.

In *Capital Tracing,* the Ninth Circuit determined that it was appropriate to invoke the doctrine of equitable tolling because a "unique situation" had arisen in an earlier Ninth Circuit case,[8] and the court had set forth "new law" in that earlier decision. That uncertainty in the court's decisional law was responsible for Capital Tracing's delay in bringing suit. The court further explained that:

> Capital's failure to know that the only way it could reclaim its bail bond was by filing a wrongful levy action was not due to its lack of due diligence. The law was unclear, and we cannot say that Capital chose an unreasonable course of action by waiting until the exoneration proceeding to assert its ownership rights over the bond. Capital exercised its rights at what it thought was the earliest opportunity....

*Id.* Moreover, the court indicated that *Capital Tracing* had undertaken action diligently. Accordingly, the court held in *Capital Tracing* that "the lack of clarity in our circuit's law on the district court's jurisdiction to determine ownership of bail funds and the absence of demonstrated prejudice to the government justifies equitable tolling of the limitations period from the date of the levy until April 16, 1991, the date we issued our opinion in *United States [v. Badger]." Id.*

In *Capital Tracing,* the doctrine of equitable tolling was invoked by the court because the claimant did not realize that the only avenue by which it could establish that it owned the funds and could reclaim the bail bond was a wrongful levy action pursuant to 26 U.S.C. § 7426. This was due to the lack of clarity in the law with respect to the appropriate judicial procedure by which to litigate ownership of bail bond funds upon which IRS had levied. In the present case, there is no such uncertainty. Nothing in ELIHPA created any uncertainty about the appropriate judicial vehicle for presenting a claim against the government to recover damages for a breach of contract based on ELIHPA. The stated reason for Celentano's delay in commencing suit is her alleged uncertainty about the duration of the prepayment moratorium. As discussed above, this uncertainty goes only to the extent of the harm resulting from the government's alleged breach of contract. She could have had no confusion regarding in which manner to contest her alleged losses. Thus, the holding in *Capital Tracing* is not dispositive in the present case. Celentano's equitable tolling argument is rejected.

Finally, because the plaintiff's claim accrued on May 11, 1990, more than six years and 224 days before the date plaintiff commenced this suit, the court need not decide whether the statute of limitations should have been tolled during the time the motion for class certification was pending in *Greenbrier v. United States,* 40 Fed.Cl. 689 (1998).

In conclusion, this court holds that plaintiff's claim first accrued on May 11, 1990, when plaintiff's contractual right to prepay her mortgage matured. As a result, the applicable six-year statute of limitations expired before the commencement of the above-captioned suit. The court, therefore, grants defendant's partial motion to dismiss plaintiff's claim for breach of contract, with prejudice.

The court, *sua sponte,* also dismisses the plaintiff's takings claim. In the interests of judicial economy, it is the obligation of the court to address matters of defective jurisdiction on its own, even if the parties have not brought a motion to dismiss. The count of plaintiff's complaint which raises a takings claim is based on the same facts as those upon which plaintiff's breach of contract claim is founded. Moreover the applicable statute of limitations in takings cases is also six years, as set forth in 28 U.S.C. § 2501.

---

**8.** *See United States v. Badger,* 930 F.2d 754, 756 (9th Cir.1991) (the court determined that the IRS could obtain a lien on a bail bond, and that if any person wishes to contest the levy, that person must bring a wrongful levy action under 26 U.S.C. § 7426).

The computation of when the applicable statute of limitations began to run given the facts presented by the above-captioned case must be applied in the same way with respect to both causes of action, breach of contract and takings. The extensive discussion above regarding when the statute of limitations began to run on plaintiff's breach of contract claim is equally applicable to plaintiff's takings claim. Plaintiff's takings claim also was filed with the court more than six years following May 11, 1990, for which reason the court does not have jurisdiction to entertain plaintiffs' suit.

## CONCLUSION

The Clerk of the Court is directed to dismiss the plaintiff's complaint.

**IT IS SO ORDERED.**