Albert **LANKSTER**, Plaintiff,

v.

**UNITED STATES**, Defendant.

No. 08–860C.

United States Court of Federal Claims.

July 22, 2009.

Albert F. Lankster, pro se, Linden, AL.

Russell A. Shultis, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, and Jeanne E. Davidson, Director, and Franklin E. White Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. Of counsel was Vanessa A. Burton, Division of Postsecondary Education, U.S. Department of Education, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Albert Lankster seeks to recover a payment he made to the Department of Education in connection with a settlement of his federal student loans. Mr. Lankster claims that he has become totally and permanently disabled and consequently that a regulation issued by the Department of Education entitles him to a return of any payments he made on his student loans. *See* Compl. ¶ 4. The government has moved to dismiss Mr. Lankster's complaint, asserting that the court lacks subject matter jurisdiction over Mr. Lankster's claim, that Mr. Lankster's claim is barred by the doctrine of laches, and that Mr. Lankster has failed to state a claim upon which relief can be granted. Def.'s Mot. to Dismiss at 1 ("Def.'s Mot."). Mr. Lankster has moved for summary judgment or judgment on the pleadings. The cross-motions have been fully briefed and are ready for disposition.

## BACKGROUND[1]

Mr. Lankster obtained two student loans under the Federal Perkins Loan Program during 1972 and 1973, in the total amount of $2,500, to help fund his education at the University of Maryland and Howard University. Def.'s Mot. at 2 & Ex. 1 (Loan Documentation for Mr. Lankster).[2] In addition to the Perkins loans, in 1972 and 1973 Mr. Lankster also received two Guaranteed Student Loans to provide additional funding for his education. Def.'s Mot., Ex. 1 (Loan Documentation for Mr. Lankster).[3] In December 1981 and October 1983, the Perkins loans that Mr. Lankster received were assigned by the University of Maryland to the Department of Education. *See id.* In January 1989, the Department of Education agreed to settle the outstanding balance on Mr. Lankster's Perkins loans for a sum of $3,000. Def.'s Mot., Ex. 2 (Contracts Services Branch Compromise Form). To satisfy the settled obligation, Mr. Lankster wrote a cashiers check payable to the United States Department of Education, dated January 27, 1989, in the amount of $3,000. Compl., Ex. B (Copy of Check); *see also* Def.'s Mot., Ex. 2 (Contracts Services Branch Compromise Form).

Ten years later, Mr. Lankster engaged in the first of several failed attempts to have his still outstanding Guaranteed Student Loans discharged. *See* Pl.'s Mot. for Order, Ex. 1 (Letter from the Department of Education (Jan. 23, 2001)). Mr. Lankster appears to have first attempted to have his Guaranteed Student Loans discharged in October 1999, when he wrote a letter to President Clinton requesting the forgiveness of his outstanding loans. *Id.* Mr. Lankster's letter was forwarded to the Department of Education, and in a letter dated January 23, 2001, the Department of Education notified Mr. Lankster that it could not forgive his debt because of financial hardship. *Id.*

On March 8, 2001, Mr. Lankster received a second letter from the Department of Education, written in response to his request that the outstanding amount owed on his Guaranteed Student Loans be forgiven. Pl.'s Mot. for Order, Ex. 1 (Letter from the Department of Education (Mar. 8, 2001)). This letter also informed Mr. Lankster that he had not supplied the necessary evidence for a discharge. *Id.*

Mr. Lankster subsequently attempted to have his Guaranteed Student Loan discharged on April 4, 2006, when he sent a request for discharge to Account Control Technology, Inc., the company employed by the Department of Education to administer Mr. Lankster's accounts. Pl.'s Mot. for Order, Ex. 1 (Letter to Account Control Technology (Apr. 4, 2006)). Included with the request were "examination reports from two U.S. Gov[ernmen]t paid doctors." *Id.* In response to this request, Account Control Technology sent Mr. Lankster a letter, dated October 3, 2006, denying his application for a disability discharge. *Id.*, Ex. 1 (Letter from Account Control Technology (Oct. 3, 2006)).

Shortly thereafter, on July 10, 2006, Mr. Lankster again applied to have the outstanding balances on his Guaranteed Student Loans discharged on the grounds that he was "totally and permanently" disabled due to a condition of paranoid schizophrenia. Pl.'s Mot. for Judgment on the Pleadings, Ex. A

---

1. The recitations that follow do not constitute findings of fact by the court. Instead, the recited factual elements are taken from the parties' filings and are either undisputed or are alleged and assumed to be true, except where a factual controversy is explicitly noted.

2. Under the Perkins Loan Program, the federal government establishes a loan fund at participating institutions of higher education. *See* Def.'s Mot. at 2 n. 1. The institutions which participate in the program match the funds provided by the federal government and make loans to their students from the fund. *Id.* The loans are initially repayable to the institution from which they originate, although the institution has the option to assign defaulted Perkins loans to the Department of Education. *Id.* Once a Perkins loan is assigned to the Department of Education, the Department does not, however, make any payments to the institution, should it receive payment from the borrower. *Id.* The Department of Education does not guarantee Perkins loans. *Id.*

3. Guaranteed Student Loans are made by private lenders, using their own money, with a guarantee by the Department of Education. *See* Def.'s Mot. at 2 n. 2. If the borrower of such a guaranteed loan defaults, the lender has the option to assign the loan to the Department of Education. *Id.*

(Loan Discharge Application); Def.'s Mot. at 3. This application was accompanied by a certification of his medical condition signed by a physician on July 10, 2006. Pl.'s Mot. for Judgment on the Pleadings, Ex. A (Loan Discharge Application). In response to Mr. Lankster's application, the Department of Education issued Mr. Lankster a "Notice of Loan Discharge" on December 6, 2007, relieving Mr. Lankster of loans totaling $9,525.14. Compl., Ex. A. (Notice of Loan Discharge). The Notice acknowledged that Mr. Lankster was "totally and permanently" disabled and that he had been "totally and permanently" disabled since January 1, 1985. *Id.* Additionally, the Notice of Loan Discharge included a statement that "[a]ny payments received by [Mr. Lankster's] previous loan holder and/or by [Federal Student Aid] after 01/01/1985 the date [that he] became totally and permanently disabled as reported by [his] physician would be returned to [him]." *Id.*

After receiving the notice of discharge, on December 20, 2007, Mr. Lankster sent the Department of Education a copy of the $3,000 cashier's check that he had written on January 27, 1989 to settle his outstanding Perkins loans, and requested a refund in the same amount. Compl. ¶ 3. The Department of Education refused Mr. Lankster's refund request. *Id.* Following that refusal, Mr. Lankster filed his complaint in this case on December 3, 2008.

### JURISDICTION

■ Before the court can proceed with the merits of this case, the jurisdiction of the court to hear the case must be established as a threshold matter. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the plaintiff, Mr. Lankster bears the burden of proving that the court has jurisdiction to consider his claim. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In determining whether jurisdiction exists, federal courts must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of plaintiff. *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.

1995). The factual allegations contained in plaintiff's claim for relief must be plausible for the court to accept them, and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although *pro se* claimants are held to a less stringent pleading standard than that applied to claimants represented by counsel, *see Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), such a claimant must nonetheless affirmatively plead subject matter jurisdiction in his or her complaint. *See Henke,* 60 F.3d at 799.

■ Pursuant to the Tucker Act, this court has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act alone, however, is insufficient to establish jurisdiction. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). To invoke jurisdiction under the Tucker Act, the plaintiff must also identify a substantive right that is enforceable against the United States and that entitles the plaintiff to money damages. *United States v. Mitchell,* 463 U.S. 206, 216–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

■ Additionally, pursuant to 28 U.S.C. § 2501, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; *see John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, ——, 128 S.Ct. 750, 753–54, 169 L.Ed.2d 591 (2008) (stating that the six-year statute of limitations provided by 28 U.S.C. § 2501 is a jurisdictional limitation on actions in the Court of Federal Claims). In applying this statute of limitations, a claim first "accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit." *Martinez v. United States,* 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc); *see also Bowen v. United States,* 292 F.3d 1383,

1385 (Fed.Cir.2002) (stating that " 'a claim against the United States first accrues on the date when all the events have occurred which fix the liability of the [g]overnment and entitle the claimant to institute an action' " (quoting *Oceanic S.S. Co. v. United States*, 165 Ct.Cl. 217, 225 (1964))).

## ANALYSIS

Relying on 34 C.F.R. § 682.402(c)(1)(i), as it existed in 2006 at the time of his successful application for discharge of his Guaranteed Student Loans, Mr. Lankster claims that he is entitled to a refund of the $3,000 he paid to the Department of Education in connection with the settlement of his Perkins loans. *See* Compl. ¶ 4.[4] This regulation provided in pertinent part that if a borrower is certified as having a total and permanent disability, then he or she is eligible to have the loans held by the Department of Education discharged and that "any payments received [from the borrower] after the date the borrower became totally and permanently disabled as certified under § 682.402(c)(2), are returned to the [borrower]." 34 C.F.R. § 682.402(c)(1)(i) (2006). The provision upon which Mr. Lankster relies was substantively altered, effective July 1, 2008, and renumbered as 34 C.F.R. § 682.402(c)(4)(iii). The current version of the regulation differs from the previous version in that it provides for the reimbursement only of payments made after a physician certified the borrower as "totally and permanently" disabled. *See* 34 C.F.R. § 682.402(c)(4)(iii) (2008).[5]

Mr. Lankster contends that his claim is grandfathered under the 2006 version of 34 C.F.R. § 682.402 because the government received his "Loan Discharge Application" prior to July 1, 2008, the date when the revised version of the regulation became effective. Pl.'s Mot. for Summary Judgment at 1. Additionally, Mr. Lankster contends that the statute of limitations did not begin to run against him until July 10, 2006, the date his physician signed the loan discharge application needed

for reimbursement. Pl.'s Mot. for Judgment on the Pleadings at 1. Mr. Lankster argues that the regulation as it existed in 2006 "sets the date of disability as the controlling consideration to be used in awarding refunds," and that those departmental officials who adopted the regulation "clearly ... intended for disabled persons to receive a refund of any payments ... made after the date of disability." *Id.* at 2.

The government contends that Mr. Lankster's claim should be dismissed on the ground that the statute of limitations began to run in 1989 and that as a result Mr. Lankster's action is time-barred. Def.'s Mot. at 7. The government supports this contention by arguing that Mr. Lankster was capable of bringing the current suit immediately upon the government's acceptance of his settlement payment in January 1989 because he had been "totally and permanently" disabled since January 1, 1985. *Id.* Alternatively, the government argues that even if this court does have jurisdiction over Mr. Lankster's claim, the claim should be dismissed on the grounds that Mr. Lankster's complaint is barred by the doctrine of laches or, in the alternative, that it fails to state a claim upon which relief can be granted. *Id.* at 1.

### A. Applicability of the Department's Regulation As It Existed in 2006

Under the Department's regulation as it exists today, Mr. Lankster would not have a claim to recover the amount he paid in 1989 to settle the amount then due on his Perkins loans. Currently, 34 C.F.R. § 682.402(c)(4)(iii) (2008) specifies that only those payments made after a physician certifies that the borrower has been totally and permanently disabled will be returned. *Id.* However, as the regulation existed before July 1, 2008, it contained no similar limitation, but rather provided that "all" past payments would be returned to those who had

---

4. In his complaint, Mr. Lankster mistakenly cites a different paragraph of this regulation as the basis for his claim, *see* Compl. ¶ 4 (referring to 34 C.F.R. § 682.402(c)(2) (2006)), but the thrust of his claim is nonetheless evident.

5. The amended regulation now provides in pertinent part that "any payments received after the physician completed and certified the borrower's loan discharge application are returned to the person who made the payments on the loan." 34 C.F.R. § 682.402(c)(4)(iii).

become disabled. *See* 34 C.F.R. § 682.402(c)(1) (2006).

■ A change in law, whether by statute or regulation, ordinarily carries a strong presumption that it is prospective in application and not retrospective. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (applying the "time-honored presumption" that conduct should be assessed under the law as it existed when the conduct occurred); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").

■ The regulatory history of the amendment is relevant to this analysis. The Department of Education included the proposed change in a package of amendments to its student loan programs published for comment in June 2007. *See* Department of Education, 72 Fed.Reg. 32,410 (June 12, 2007). The Department proposed to amend Section 682.402 to eliminate "two onset dates" for disability, the date of actual disability and the date a disability was certified by a physician, which had "create[d] program integrity issues in the administration of the total and permanent disability discharge process." *Id.* at 32,414. As the Department noted, "in many cases, certifying physicians [had] to rely solely on the ... statements [of the individual seeking to be classified as disabled] in determining a date of disability onset." *Id.* The Department commented that in such instances "there [might] not be a strong medical basis for using [the date of disability provided by the borrower's doctor] as a date for establishing eligibility for [f]ederal benefits." *Id.*

The Department adopted the final regulation on November 1, 2007, *see* 72 Fed.Reg. 61,960–62,011 (Nov. 1, 2007), essentially adopting the amendment as proposed but with clarifying changes to, among other things, provide that reimbursement would be made "to the person who made the payment after the final discharge is issued." *Id.* at 61,965. Most of the Department's commen-

tary in the preamble to the final adoption concerned the trigger for repayment:

> Many commenters disagreed with the Department's proposal in §§ 674.61(b)(5), 682.402(c)(4)(iii), and 684.213(d)(3)(ii) that only payments made on the loan after the date the physician certifies the borrower's total and permanent disability discharge application would be returned to the borrower. The commenters claimed this proposal would harm borrowers who do not obtain a timely certification of disability or who continue to make payments to keep from defaulting or becoming delinquent on their loans.

*Id.* The Department rejected this criticism of the proposal, endeavoring "to maintain program integrity in the administration of the discharge process," *id.*, and to avoid "creating an opportunity for fraud." *Id.* at 61,966.

In adopting the final regulatory amendments, the Department of Education also expressly addressed effective dates. "One commenter [had] requested that the effective dates and trigger dates in the proposed regulations be carefully evaluated so that borrowers who are in the process of having discharge forms certified are not subject to the new requirements." 72 Fed.Reg. at 61,966. The Department established an effective date for the amendments of July 1, 2008, eight months after adoption, to provide time for the transition to the new regulatory provisions. *See id.* at 61,960. As the Department put it, "[b]orrowers who are in the process of having discharge forms certified as of that date will not be subject to the new regulations." *Id.* at 61,966. Accordingly, the Department explicitly indicated its intention to apply the new regulatory requirements prospectively. As a result, because Mr. Lankster filed his application for discharge in this case on July 10, 2006, the pre–2008 version of 34 C.F.R. § 682.402(c) governs this case, and his claim is not barred by the current version of 34 C.F.R. § 682.402(c).

### B. Statute of Limitations

In addressing whether Mr. Lankster's claim is barred by the six-year statute of limitations, the court must identify when Mr. Lankster's claim first accrued. Mr. Lankster asserts that his claim first accrued on

July 10, 2006, the date his doctor signed his loan discharge application. Pl.'s Mot. for Judgment on the Pleadings at 1. Mr. Lankster bases this assertion on the ground that "the Code of Federal Regulations sets the date of disability as the controlling consideration to be used in awarding refunds." *Id.* at 2. Conversely, the government asserts that Mr. Lankster's claim first accrued in January 1989, arguing that by then Mr. Lankster was "totally and permanently" disabled and had already paid the settlement for which he now seeks reimbursement. Def.'s Mot. at 7. Accordingly, the government contends that all events necessary to fix liability had occurred by January 1989. *Id.*

No prior reported judicial decision appears to have addressed the date of first accrual as it relates to claims arising under 34 C.F.R. § 682.402(c) (2006). Nonetheless, guidance in this respect can be gleaned from the decisions in *Martinez v. United States*, 333 F.3d 1295 (Fed.Cir.2003) (en banc), and *Chambers v. United States*, 417 F.3d 1218 (Fed.Cir. 2005), two cases involving claims by discharged servicemen considered by the Court of Appeals for the Federal Circuit.

In *Martinez*, an ex-serviceman sought back pay due to a wrongful discharge. *See* 333 F.3d at 1299–300. The primary issue facing the court in *Martinez* was whether Mr. Martinez's claim accrued on the date of his discharge or whether his claim accrued on the date that the Army Board for Correction of Military Records ("Army Correction Board") officially denied his application to have his discharge voided. *Id.* at 1301. The court held that because the monetary injury for which Mr. Martinez brought suit occurred on the date of his discharge, and because Mr. Martinez was not required to apply for a remedy from the Army Correction Board prior to bringing suit under the Tucker Act, his claim accrued on the date of his discharge. *Id.* at 1313.

In *Chambers*, the Federal Circuit addressed facts that differed from *Martinez* in an important respect. The plaintiff had unsuccessfully attempted, by way of an application to the Army Correction Board, to reopen his discharge to determine whether he was entitled to disability retirement pay. *Cham-*

*bers*, 417 F.3d at 1222. Subsequent to the Army Correction Board's denial of his application, Mr. Chambers brought suit pursuant to the Tucker Act, claiming that he was "entitled to a judgment awarding him 'disability retirement pay from ... April 1970 through ... June 2003.' " *Id.* As in *Martinez*, a primary issue presented to the court in *Chambers* was whether Mr. Chambers' claim first accrued on the date of his discharge, or whether his claim accrued on the date the Army Correction Board denied his application to have his discharge re-opened. *Id.* at 1223. The Court of Appeals held that the date of first accrual for Mr. Chambers' claim was the date on which the Army Correction Board had denied his application for disability-retirement pay. *Id.* at 1224. Unlike in *Martinez*, where plaintiff's application for relief to the Army Correction Board was optional, Mr. Chambers was found to have been incapable of bringing suit on his claim until the Army Correction Board acted on his disability-retirement claim. *See id.* (distinguishing *Martinez* by stating that in *Martinez* the Correction Board "constitute[d] a 'permissive' ... remedy", while in *Chambers* it was mandatory that the plaintiff seek a remedy from the Army Correction Board prior to bringing suit).

Accordingly, the crucial question in determining the date of first accrual in this case is whether 34 C.F.R. § 682.402(c)(1)(i) (2006) mandated that Mr. Lankster apply for a loan discharge from the Department of Education on the grounds of his disability prior to being eligible to bring suit, or whether Mr. Lankster instead had a cause of action prior to the Department of Education's determination that his disability either did or did not entitle him to a discharge. In this respect, 34 C.F.R. § 682.402(c)(1)(i) (2006) specifically stated that for a student loan recipient to be eligible for a loan discharge based upon a disability "the Secretary [must make] an initial determination that the borrower is totally and permanently disabled." 34 C.F.R. § 682.402(c)(1)(i) (2006). Therefore, Mr. Lankster's claim more closely mirrors the plaintiff's claim in *Chambers* because the regulation upon which Mr. Lankster relies requires, rather than allows, that he apply

for a loan discharge through the Department of Education.

██ Consequently, Mr. Lankster's claim first accrued on December 6, 2007, because that was the first date the Department of Education took action on his application for a loan discharge based upon his disability. Because the date of first accrual in this case, December 6, 2007, falls within the six-year limitations period, Mr. Lankster's claim is not time-barred.

### C. Laches Defense

The government nonetheless asserts that Mr. Lankster's claim is barred by the doctrine of laches because Mr. Lankster could have pursued his claim as early as 1989, twenty years ago, had he diligently engaged in the disability certification process. Def.'s Mot. at 9. Mr. Lankster contends that inaction on the part of the Department of Education caused him to delay bringing the current suit and that, as a result, the doctrine of laches does not apply. Pl.'s Mot. for Judgment on the Pleadings at 1. Mr. Lankster specifically claims that the Department of Education did not provide him with the necessary loan discharge application forms in a timely manner. *Id.*

██ Laches is an equitable defense that properly applies when a party through neglect or delay fails to diligently pursue a claim. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028–29 (Fed.Cir. 1992) (en banc). Because laches is an equitable doctrine, in actions at law for which "a limitation on the period for bringing suit has been set by statute, laches will generally not be involved to shorten the statutory period." *Advanced Cardiovascular Sys. v. SciMed Life Sys.,* 988 F.2d 1157, 1161 (Fed.Cir.1993). "As a conceptual matter, an exception to this general rule may be established upon a show-

ing of sufficient prejudice to the government, and in this respect the government bears a relatively heavy burden of proof." *Cygnus Corp. v. United States,* 63 Fed.Cl. 150, 154 (2004) (citing *Cornetta v. United States,* 851 F.2d 1372, 1380 (Fed.Cir.1988) (en banc)), *aff'd,* 177 Fed.Appx. 86 (Fed.Cir.2006). For a defendant to raise a successful laches defense, it must prove that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) that "the delay [by the claimant] operated to the prejudice or injury of the defendant." *A.C. Aukerman Co.,* 960 F.2d at 1032. "Whether laches bars an action in a given case depends upon the circumstances of [the] case and 'is a question primarily addressed to the discretion of the trial court.'" *See Burnett v. N.Y. Cent. R.R. Co.,* 380 U.S. 424, 435, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965) (quoting *Gardner v. Panama R.R. Co.,* 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951)).

Mr. Lankster unquestionably delayed pursuing his application for reimbursement of the payment he made in settlement of his Perkins loans.[6] Nonetheless, because Mr. Lankster filed his complaint within the time prescribed by the relevant statute of limitations, the real question is whether the government has shown sufficient prejudice to justify dismissal of Mr. Lankster's claim based on laches.

██ The government must show either material "defense prejudice" or material "economic prejudice." *See, e.g., A.C. Aukerman Co.,* 960 F.2d at 1033; *Cornetta,* 851 F.2d at 1378. "'Defense prejudice' may include loss of records, destruction of evidence, fading memories, or unavailability of witnesses[,]" while "economic prejudice[ ] cen-

---

6. In July 2006, Mr. Lankster was certified as "totally and permanently" disabled as of 1985, and as a result could have applied to have his Perkins loans and Guaranteed Student Loans discharged over twenty years ago. *See* 34 C.F.R. § 682.402(b)(1) (1984) ("If a borrower who received a loan after December 14, 1968 dies or becomes totally and permanently disabled, the Secretary cancels the borrower's obligation by paying the lender the amount owed."). Indeed,

he arguably could have obtained a discharge of his loans rather than have settled with the Department of Education in January 1989. The fact that the Department did not send Mr. Lankster a loan discharge application at an earlier date is not meaningful because Mr. Lankster could simply have asked the Department to send him such a form, and there is no evidence that he did so.

ters on consequences, primarily monetary, [that the government will endure] should the claimant prevail." *Cornetta,* 851 F.2d at 1378.

█ The government's assertions of prejudice fall into both of these categories. First, the government claims it had "some difficulty gathering documentation regarding [Mr. Lankster's] debt that was paid over 20 years ago." Def.'s Mot. at 9. Nonetheless, the government succeeded in retrieving the pertinent records, and consequently any claim of defense prejudice has proven not to be substantial.

The government also asserts that it would be prejudiced if Mr. Lankster were permitted to pursue the present claim because allowance of such a suit would permit "any borrower ..., at any time after paying off a loan, [to] submit a loan discharge form and receive a refund." Def.'s Mot. at 9. This assertion lacks persuasive force. The fault, if any, inheres in the Department's regulation as it stood prior to the amendment adopted in November 2007, which took effect July 1, 2008.

In short, the government's claims of prejudice are unconvincing and thus the government does not have a valid laches defense. *See A.C. Aukerman Co.,* 960 F.2d at 1032 (stating that both unreasonable delay and material prejudice must be shown for a laches defense to be successful).

*D. Applicability of 34 C.F.R. § 682.402(c) (2006) to a "Settlement Payment"*

The government asserts that 34 C.F.R. § 682.402(c) (2006) allows for the reimbursement only of "payments" made on "discharged loans" and that as a result Mr. Lankster's current claim should be dismissed for failure to state a claim because his Perkins loan debt was "settled" as opposed to "discharged." Def.'s Mot. at 10. Mr. Lankster in response asserts that specific language in 34 C.F.R. § 682.402(c)(1)(i) (2006) requires the Department of Education to return any money he paid to it in connection with either his Perkins loans or his Guaranteed Student Loans following the onset of his total and permanent disability in 1985, including the $3,000 "payment" he made to the Department of Education, in 1989, to settle his Perkins loans. *See* Compl. ¶¶ 3–4.

Section 682.402(c)(1)(i) (2006) provides in pertinent part that

[i]f the Secretary has made an initial determination that the borrower is totally and permanently disabled ... the loan is conditionally discharged for up to three years from the date that the borrower became totally and permanently disabled, as certified by a physician. The Secretary suspends collection activity on the loan from the date of the initial determination of total and permanent disability until the end of the conditional period. If the borrower satisfies the criteria for a total and permanent disability discharge during and at the end of the conditional discharge period, *the balance of the loan is discharged at the end of the conditional discharge period and any payments received after the date the borrower became totally and permanently disabled ... are returned to the sender.*

34 C.F.R. § 682.402(c)(1)(i) (2006) (emphasis added).

█ The context of the use of the word "payments" in this regulation strongly suggests that reference is being made to the periodic payment of principal and interest on a discharged loan. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain ... the sole function of the courts is to enforce it according to its terms."); *see also Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Additionally, the reference to "collection activity" in the provision further supports a reading of the word "payments" to include only payments made on a still-outstanding debt, given that no collection activity can take place once a loan is settled. *See* 34 C.F.R. § 682.402(c)(1)(i) (2006) (referring to the suspension of collection activity).

█ To read the word "payments," as it exists in 34 C.F.R. § 682.402(c)(1)(i) (2006),

to include "settlement payments" would require a finding that the Department of Education, when authoring the regulation, intended to disregard the contractual doctrine of accord and satisfaction, which provides that when a lender and a borrower willingly enter into a full settlement regarding the discharge of an unpaid debt at a discounted amount or on other grounds, each party is completely freed from obligations owed to the other party under the original loan agreement. *See, e.g. Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 343 F.2d 951, 954–55 (1965) (holding that the complete settlement of an outstanding obligation barred suit as a result of the presence of an accord and satisfaction). In practice, the Department of Education enters settlement agreements with delinquent borrowers as accord and satisfaction contracts; *see* Def.'s Mot., Ex. 2 (Ingram & Associates Letter (Jan. 26, 1989)) (showing that the Department of Education engaged in a "full settlement" with Mr. Lankster), and is therefore aware of, and operates in accordance with, the doctrine. Consequently, to accept Mr. Lankster's interpretation of the word "payments" to include settlement payments would have the court construe the word "payments" in a manner that contravenes basic principles and understandings. "Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *see also Haggar Co. v. Helvering,* 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940) ("A literal reading of [a statute] which would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose.").

Finally, use of the word "payment" elsewhere in the regulation clarifies the intended meaning of the word "payments" as it exists in former Section 682.402(c)(1)(i). *See United Sav. Ass'n of Tx. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (stating that when determining the meaning of a particular statutory provision it is proper for a court to examine the statute in context because "[a] provision that may seem ambiguous in iso-

lation is often clarified by the remainder of the statutory scheme."). Specifically, former Section 682.402(c)(5) states that "[i]f the lender determines that a borrower who claims to be totally and permanently disabled is not totally and permanently disabled ... the lender must resume collection and is deemed to have exercised forbearance of payment of both principal and interest from the date collection activity was suspended." 34 C.F.R. § 682.402(c)(5) (2006). Former Section 682.402(c)(5) thus uses "payment" to refer to both principal and interest on an outstanding debt. *See Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) ("It is well established that our task in interpreting separate provisions of a single Act is to give the Act 'the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose.") (quoting *Clark v. Uebersee Finanz–Korporation, A.G.,* 332 U.S. 480, 488, 68 S.Ct. 174, 92 L.Ed. 88 (1947)).

In short, the word "payments," as it existed in 34 C.F.R. § 682.402(c)(1)(i) (2006), was intended to refer to principal and interest payments made on a discharged loan. Consequently, the $3,000 payment that Mr. Lankster made to the Department of Education in 1989 to settle his delinquent Perkins loans is not reimbursable pursuant to the regulation upon which he relies. Mr. Lankster's complaint thus fails to state a claim upon which relief can be granted, and it should therefore be dismissed pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims.

### CONCLUSION

For the reasons stated, the government's motion to dismiss is GRANTED, and this case shall be dismissed for failure to state a claim upon which relief can be granted. Plaintiff's motions for summary judgment and judgment on the pleadings are DENIED. The Clerk shall enter judgment accordingly. No costs.

It is so **ORDERED.**