ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Restoration Specialists, LLC | ) ASBCA No. 63284 |
| | ) |
| Under Contract No. FA4418-13-D-0006 | ) |

APPEARANCES FOR THE APPELLANT:     A. Bright Ariail, Esq.
Warren W. Ariail, Esq.
  Law Office of A. Bright Ariail, LLC
  Charleston, SC

APPEARANCES FOR THE GOVERNMENT:     Caryl A. Potter, III, Esq.
  Air Force Deputy Chief Trial Attorney
Aaron Weaver, Esq.
  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE MCLISH ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

This appeal involves a contract for base engineering services at Joint Base Charleston in South Carolina. The appellant, Restoration Specialists, LLC (Restoration), asserts a variety of claims arising out of the contract and task orders issued against it. The claims arise against a backdrop in which a government contracting officer and the owner of one of Restoration's subcontractors engaged in criminal misconduct, eventually leading to federal indictments and guilty pleas.

The government moves for summary judgment in its favor on all of Restoration's claims on the ground that they were not submitted to the government's contracting officer within six years of when they accrued, as required by the Contract Disputes Act (CDA), 41 U.S.C. § 7103(a)(4)(A). Restoration submitted its claims to the contracting officer on January 12, 2022. Therefore, the claims are time-barred if they accrued before January 12, 2016, unless salvaged by equitable tolling. The government also challenges the merits of some of the claims.

Restoration opposes the motion, arguing that disputes of fact over whether the claims were timely filed preclude summary judgment and that in any event it is entitled to take discovery before we rule on the motion. Restoration also disputes the government's arguments as to the merits of the claims. In the course of briefing, Restoration withdrew one claim, which we therefore dismiss.

We find that Restoration has failed to show that allowing it to take discovery could affect the outcome of the government's motion for summary judgment. We further find that the undisputed material facts demonstrate that, with one exception, each claim accrued before January 12, 2016, and that Restoration is not entitled to equitable tolling. The exception is Restoration's claim for funds remaining on the contract, as to which there are material issues of fact precluding summary judgment. Accordingly, the government is entitled to summary judgment on all but one of the claims. We find it unnecessary to address the government's arguments as to the merits of any of the claims.

We begin with a brief overview of the facts and then set out the applicable standard of review and the legal framework for addressing the statute of limitations issues. We then address the particulars of each of Restoration's claims in turn.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

Joint Base Charleston - Weapons Station (JBC-WS), South Carolina, requested proposals for a contract to provide base engineering services (R4, tab 2) (Solicitation No. FA4418-12-R-0004, dated July 11, 2012) (RFP)). The successful contractor would perform projects for a range of maintenance, repair and minor construction work at the base. The projects would be specified in individual task orders issued against the contract. (App. supp. R4, tab 8 at 3) The RFP provided that certain prices would be calculated using a formula. Elements of the formula included a "coefficient" to be proposed by the offeror and a "City Cost Index" (CCI) for Charleston published by the RS MEANS Company. (*Id.* at 3)

Restoration submitted a proposal, including a proposed coefficient (R4, tab 10 at 11-12, tab 11 at 47-51). Communications between the government and Restoration regarding Restoration's proposed coefficient revealed that there was a disagreement over how the coefficient and CCI were to be used in calculating prices. The government held discussions with Restoration and other offerors on that subject. The discussion did not result in any changes to Restoration's proposal. (R4, tabs 15, 17-18; app. resp., exs. E, F,G)

Restoration was awarded Contract No. FA4418-13-D-0006 (Contract) on July 3, 2013 (R4, tab 21). The Contract was for one base year and four option years and had a not-to-exceed amount of $45,000,000 (*id.* at 2-3). The government awarded 17 task orders (Task Orders 1-17) to Restoration between July 9, 2013 and December 10, 2013 (R4, tabs 25, 42, 58, 67, 82, 101, 117, 131, 144, 159, 181, 194, 215, 229, 247, 262, 275). Restoration's proposed coefficient and the pricing formula

2

were used in the initial pricing of each task order, which was then sometimes further negotiated (tr. 6-7, 11)[1].

Restoration's proposal for the Contract had indicated that it and Williams Specialty Services (Williams) were teaming partners, that the proposal was a collaborative effort between Restoration and Williams, and that Williams would be Restoration's primary subcontractor (R4, tab 11 at 4). After award of the Contract, Restoration subcontracted with Williams. Williams did not fulfill all of its subcontract responsibilities and was never issued work directives for specific task order subcontract work. (Reuben Mark Ward Affidavit (Ward aff.) ¶ 6)

Based on the recommendations of Barbara Powell, who was the contracting officer, and other government officials, Restoration had discussions with Residential Construction (ResCon) about taking over Williams' role (*id.*). Appellant hired ResCon as a sub-contractor for the Contract in late 2013 (gov't mot. at 10 ¶ 12; app. resp. at 24 ¶ 12). ResCon's principal, Richard Darnell, loaned money to Reuben Mark Ward, Restoration's owner, to assist Ward in relocating to the Charleston area so he could be close to the worksite (Ward aff. ¶ 7). Ward and Darnell agreed that the advances would be repaid from early proceeds under the Contract at a premium with a 15% markup (*id.*). Restoration reimbursed the advances and paid the additional 15% as agreed (*id.*).

On March 26, 2014, the government preliminarily informed Restoration that it intended to exercise the first option year of the Contract (app. supp. R4, tab 15). On May 27, 2014, however, the government told Restoration that it had decided not to exercise the first option to extend the Contract (R4, tab 383). The decision to reverse course was made by Robert Hood, the Chief of the Construction Acquisition Flight for the 628th Contracting Squadron at Joint Base Charleston, on the advice of Barbara Powell (app. resp., ex. C at 12).

Not long after that, in June 2014, Ward told government officials that he believed that Powell was engaged in various acts of potentially illegal wrongdoing that included colluding with and accepting bribes from Darnell, owner of ResCon (app. supp. R4, tabs 297-99; gov't mot., exs. B, C[2]). The government began an investigation.

---

[1] References to "tr." are to the transcript of the oral argument held on September 21, 2023.

[2] *See* footnote 4 below addressing Restoration's objections to exhibits B and C to the government's motion.

On July 9, 2014, Restoration directed ResCon to stop all work related to the Contract on the grounds that ResCon failed to provide Restoration with proof of South Carolina State contractor's license (app. supp. R4, tab 309 at 2). On July 15, 2014, Restoration terminated its relationship with ResCon (app. supp. R4, tab 311).

On June 23, 2015, the government determined that, although the work on several task orders was behind schedule, it would not assess liquidated damages against Restoration and would instead "allow the contractor to finish outstanding task orders without assessing liquidated damages due to the unknown outcome of the on-going legal investigation" (gov't mot., ex. E at 53).

Restoration completed the work under the Contract on or about January 19, 2016. (compl. ¶ 64).

Powell and Darnell were eventually indicted by a federal grand jury for alleged federal crimes in connection with contract work at Joint Base Charleston (app. supp. R4, tab 318). On February 28, 2017, Darnell pled guilty to Misprision of Felony. (compl. ¶ 67; gov't mot. at 13). On August 29, 2017, Powell pled guilty to Bribery of a Public Employee (compl. ¶ 69; gov't mot. at 14; app. supp. R4, tab 319).

Between July 25, 2018, and October 3, 2018, the government issued 16 unilateral modifications deobligating funds remaining on task orders issued under the Contract. (R4, tabs 37, 55, 62, 78, 96, 112, 128, 140, 154, 177, 190, 210, 223, 258, 271, 284).

On January 12, 2022, just shy of six years after it completed the last of the contract work, Restoration filed a certified claim with the contracting officer asserting that the government had breached the Contract (including the implied duty of good faith and fair dealing), caused delay, and imposed extraordinary requirements, all of which damaged Restoration (R4, tab 387). The claims and alleged damages were:

1. The government wrongfully applied the CCI, reducing Restoration's coefficient by 20.4 percent, causing $609,539.47 in damages.

2. The government wrongfully forced Restoration to hire additional subcontractors to complete the remaining work following Restoration's termination of ResCon, resulting in an extra $59,033.61 in expenses.

3. The government wrongfully decided not to exercise the Contract's option years, causing lost profits of $2,880,000.

4. The government directed Restoration to continue performance of task orders under the Contract through January 19, 2016, causing it to maintain an additional

4

superintendent and safety manager and incur additional staffing overhead at an increased cost of $925,696.45.

5. The government engaged in bad faith and improper actions that caused Restoration to continue performance of task orders under the Contract through January 19, 2016, and resulted in additional direct costs of $40,227.75.

6. The government failed to timely process progress payments and improperly withheld liquidated damages, forcing Restoration to borrow money to fund the work, resulting in interest and fees of $200,250.

7. The government imposed cost estimates on Appellant rather than using the Contract's required pricing method, resulting in a discrepancy of $614,459.39.

8. The government canceled Task Order 14 under the Contract and paid Restoration only for the work performed under Task Order 14, resulting in lost profits of $11,287.40.

9. The government failed to award Task Order 18 under the Contract to Restoration, despite negotiating Task Order 18 and directing Restoration to add an additional safety manager and superintendent in anticipation of the award, resulting in lost profits of $43,208.35.

10. The government refused to process a change order to Task Order 5, resulting in damages of $10,644.74.

11. The government refused to process a change order to Task Order 13, resulting in damages of $24,880.54.

12. Restoration also sought payment of $49,350.01 in funds remaining on the Contract.

(*Id.*)

By final decision dated February 16, 2022, the contracting officer denied the first eleven claims listed above but granted the claim for $49,350.01 in funds remaining on the Contract (R4, tab 388). After the final decision, but before Restoration filed this appeal, the government destroyed the hard copy of the contract file. According to an affidavit by the contracting officer, the file was destroyed by mistake. The contracting officer acknowledges that the remaining electronic version of the file is incomplete. (App. resp., ex. A).

Restoration timely filed this appeal on May 13, 2022.

<u>DECISION</u>

## I.     Standard of Review for Summary Judgment

In deciding summary judgment motions, the Board looks to Rule 56 of the Federal Rules of Civil Procedure for guidance.  Board Rule 7(c)(2); *Fluor Intercontinental, Inc.*, ASBCA Nos. 62550, 62672, 22-1 BCA ¶ 38,105 at 185,099. Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).  The applicable substantive law identifies which facts are material and might affect the outcome of the appeal.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has satisfied its initial burden, the opposing party "'must set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  Our task at this stage is not "to weigh the evidence and determine the truth of the matter, but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial."  *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Liberty Lobby*, 477 U.S. at 249).  A dispute is genuine only if, on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant.  *Liberty Lobby*, 477 U.S. at 248.  The evidence must be viewed in the light most favorable to the party opposing the motion.  *Crown Operations,* 289 F.3d at 1375.

## II.     The CDA's Statute of Limitations

The government contends that all of Restoration's claims are time-barred.  The Contract Disputes Act requires, in pertinent part, that "each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim."  41 U.S.C. § 7103(a)(4)(A).

"[W]hen a CDA claim accrued is determined in accordance with the FAR, the conditions of the contract, and the facts of the particular case."  *Triple Canopy, Inc. v. Sec'y of the Air Force*, 14 F.4th 1332, 1339 (Fed. Cir. 2021) (quoting *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016)); *Elec. Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020).  The Federal Acquisition Regulation (FAR) defines "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known.  For liability to be fixed, some injury must have occurred.  However, monetary damages need not have been incurred." FAR 33.201.

6

We apply an objective standard to determine whether the pertinent events have occurred; "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.'" *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1381 (Fed. Cir. 2012) (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)). Rather, the limitations period begins to run when a party is on notice that it has a potential claim. *ThinkGlobal, Inc. v. Dep't of Commerce*, CBCA 4410, 16-1 BCA ¶ 36,489 at 177,793 (quoting *Cardinal Maint. Serv., Inc.*, ASBCA No. 56885, 11-1 BCA ¶ 34,616, at 170,610).

Likewise, while "some injury" must have occurred for a claim to accrue, actual monetary damages need not have been incurred. *Elec. Boat Corp. v. Sec'y of the Navy*, 958 F.3d at 1376. "Claim accrual does not depend on the degree of detail provided . . . . It is enough that the [party] knows, or has reason to know, that some costs have been incurred, even if the amount is not finalized or a fuller analysis will follow." *Raytheon Co., Space & Airborne Systems*, ASBCA No. 57801 *et al.*, 13 BCA ¶ 35,319, at 173,377. When monetary damages are alleged, "some extra costs must have been incurred before liability can be fixed and a claim accrued, but there is no requirement that a sum certain be established." *Macro-Z Tech.*, ASBCA No. 60592, 19-1 BCA ¶ 37,358 at 181,657 (quoting *The Boeing Co.*, ASBCA No. 58660, 15-1 BCA ¶ 35,828 at 175,190). It is enough that some dollar figure can be placed on the claim, even if the total amount that will eventually be claimed cannot yet be determined. *Patricia I. Romero, Inc. d/b/a/ Pacific West Builders*, ASBCA No. 63093, 23-1 BCA ¶ 38,362 at 186,289. The amount of the claim can be adjusted as further information is developed. *Id.*; *Macro-Z Tech.*, 19-1 BCA ¶ 37,358 at 181,658.

The events fixing liability are presumed to have been known when they occurred unless it is reasonable to find they have been either concealed or were "inherently unknowable" at that time. *Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 23-1 BCA ¶ 38,373 at 186,403. Under the accrual suspension rule, "the accrual of a claim against the United States is suspended . . . until the claimant knew or should have known that the claim existed." *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003). For accrual suspension to apply, the claimant must demonstrate that either the government concealed information necessary for the claimant to understand that it had a claim or that the claimant's injury was "inherently unknowable" at the time of accrual. *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008); *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985); *Afghan Premier Logistics*, 23-1 BCA ¶ 38,373 at 186,403.

A party's failure to submit a claim within six years of accrual is an affirmative defense to the claim, for which the party invoking the defense bears the burden of proof. *Kellogg Brown & Root Servs., Inc.*, ASBCA No. 58175, 15-1 BCA ¶ 35,988 at 175,823. Accordingly, here, the government bears the burden of demonstrating that

7

Restoration's claims accrued more than six years before Restoration submitted them to the contracting officer on January 12, 2022.

### III. Restoration Has Not Shown that it Needs Discovery to Oppose the Government's Motion

We first address Restoration's contention that it needs discovery before we may decide the government's motion. Summary judgment is not appropriate where the non-moving party has not had an opportunity to obtain discovery necessary to oppose the movant's contention that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(d). To show entitlement to Rule 56(d) discovery, the non-moving party must establish by affidavit or declaration that "for specified reasons, it cannot present facts essential to justify its opposition." *Id*. The affidavit must "explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts." *Odyssey Int'l, Inc.*, ASBCA Nos. 62062, 62279, 21-1 BCA ¶ 37,902 at 184,071.

Restoration has not made the necessary showing. It has not demonstrated that it lacks information necessary to oppose the government's motion or that discovery could generate information that might affect whether its claims are time-barred. As described above, the statute of limitations analysis focuses primarily on when Restoration learned or should have learned of the facts giving rise to its claims and when it suffered some injury. Whether Restoration is entitled to equitable tolling of the limitations period is likewise based on the reasons for the delay in Restoration's submission of its claims. The information necessary to answer these questions should be in Restoration's possession and Restoration does not identify any relevant information that is not. There is no reason to believe that any additional information it might obtain in discovery would have any bearing on the issues raised by the government's motion.

The declaration from Restoration's counsel does not establish that it cannot present facts essential to justify its opposition to the government's motion. Almost all of the facts that the declaration describes as necessary to oppose the motion go solely to the merits of Restoration's claims and are not relevant to the statute of limitations issue (*see* decl. of A. Bright Ariail ¶ 13). The closest the declaration comes to identifying any relevant facts that are unavailable without discovery is its generic reference to "[i]nformation related to dates that certain events occurred related to individual delivery orders and/or other SABER Contract actions" (*id.* ¶ 13(a)). But the declaration does not specify any such dates that Restoration needs to discover in order to oppose the motion or explain why it does not already know when the events giving rise to its claims occurred. While the declaration understandably makes much of the government's admitted destruction of the hard copy contract file, it fails to provide any reason to believe that the file would contain any information Restoration does not

8

already have that is relevant to the timeliness issue, which focuses on what Restoration knew and when, not on what the government might have known and when.

Accordingly, Restoration has not met its burden to show that it needs discovery in order to oppose the government's motion. *See Afghan Premier Logistics,* 23-1 BCA ¶ 38,373 at 186,405-06 (because the discovery sought could not change the results, no basis for requiring discovery before deciding summary judgment motion).

## IV.    Accrual of Restoration's Claims

### A.  Restoration's Theories of a Single Claim Accrual Date Are Incorrect

Restoration initially contends that all of its claims accrued on a single date. It argues that this was either January 19, 2016, when contract work was completed (app. resp. at 35), or October 3, 2018, when the government issued the final unilateral modifications deobligating funds from the Contract (tr. 15). Because Restoration's claim accrual theories are contrary to binding precedent, they must be rejected.

At oral argument on the government's motion, Restoration argued for the first time its claims are not time-barred because it is asserting a "global claim" encompassing all of the government's alleged misdeeds during the project (tr. 9). Relying solely on *Europe Asia Constr. Logistics,* ASBCA No. 61553, 19-1 BCA ¶ 37,267, Restoration argues that this "global claim" accrued when the government issued unilateral modifications deobligating funds from the Contract in July through October 2018 (tr. 9-11, 13, 66-67). This argument is without merit. Neither the CDA, the FAR nor applicable precedent recognize the concept of a "global claim" that alters the claim accrual analysis set forth above. Rather, the statute of limitations runs against each "distinct liability-creating event having its own associated damages." *Certified Constr. Co. of Ky., LLC*, ASBCA No. 58782, 14-1 BCA ¶ 35,662 at 174,571 (quoting *Fluor Corp.*, ASBCA No. 57852, 14-1 BCA ¶ 35,472 at 173,930). To determine when the events fixing the alleged liability occurred, and thus when a claim accrued, we must examine the legal basis for each claim. *Macro-Z Tech.*, ASBCA No. 60592, 19-1 B.C.A. ¶ 37,358 at 181,654. *See also* 41 U.S.C. § 7103(a)(4)(A) ("*Each claim* . . . shall be submitted within 6 years after the accrual of the claim.") (emphasis added). Each of Restoration's claims, therefore, is subject to a separate accrual analysis.

Restoration's reliance on our decision in *Europe Asia* is misplaced. That decision did not hold, as Restoration would have it, that claims under a contract do not accrue until funds are deobligated from that contract. Instead, the Board found in the circumstances of that case that the contractor knew or should have known of the events fixing the government's alleged liability on the date the government deobligated funds. *Europe Asia*, 19-1 BCA ¶ 37,267 at 181,350. Because the contractor did not assert its

9

claim for more than six years after the deobligation, the claim was clearly time-barred. *Id.* at 181,351. The Board did not need to, and did not, address whether the contractor's claims may have accrued earlier than the deobligation. Therefore, that decision is not authority for Restoration's notion that a claim that would be time-barred under our standard accrual analysis is nonetheless timely if asserted within six years of the deobligation of funds.

Restoration further suggests that its claims could not have accrued until it completed work on the Contract in January 2016, because only then could it know the amount of its damages and thus calculate the "sum certain" that is required of monetary claims under the CDA. We have rejected this argument before and do so again now. *See Patricia I. Romero*, 23-1 BCA ¶ 38,362 at 186,289 (citing cases). In short, while a monetary claim must state a sum certain, it need not be the final claim amount. *Id.* As FAR 33.201 makes clear, a claim accrues when "some injury" occurs, not when all of the injury has occurred.

Because there is no merit to Restoration's efforts to fix a single accrual date for all of its claims, we now turn to the required claim-by-claim analysis.

## B. The Pricing Coefficient Claim Accrued Before January 12, 2016

Restoration claims that the government wrongfully applied the CCI, reducing Restoration's coefficient by 20.4 percent, causing $609,539.47 in damages (compl. ¶ 95(a)).

As noted above, the RFP stated that the task orders to be issued under the eventual contract would be priced using a formula (Pricing Formula). Specifically, "[t]he unit prices shall be as specified in the unit price database provided by the RS MEANS Company, current as of the date of the basic contract period, multiplied by the Charleston, SC City Cost Index (CCI), and then multiplied times the coefficient entered below" (R4, tab 2 at 8).[3] The "coefficient entered below" referred to coefficients that the RFP directed offerors to propose for use in the Pricing Formula (*id.* at 62). The RFP directed offerors to explain how the coefficients were developed (*id.* at 63). The RFP also included a formula for the calculation of a coefficient (Coefficient Formula) to be used "as a guide," as well as an example of the application of that formula (*id.*).

_____

[3] Although it is the Board's practice to make all of its factual findings in the Statement of Facts sections of our decisions, the large number of individual claims we need to address in this particular opinion makes it necessary and appropriate for us to include some facts specific to the individual claims here in the Decision section where we address those claims.

In response to the RFP, Restoration submitted a proposal for the contract in August 2012 (R4, tabs 10-11). Restoration's price proposal specified a standard coefficient of 0.98 and explained how it had calculated that number using the Coefficient Formula (R4, tab 10 at 47-51). In April 2013, the government and Restoration communicated regarding Restoration's proposed coefficient. The parties disagreed over how the coefficient was to be used in calculating task order unit prices. (App. resp., exs. E, F, G). The government maintained that the pricing must be done using the Pricing Formula (RS MEANS unit prices x the Charleston CCI x the coefficient). Restoration maintained that the government's position would result in the CCI factor being applied twice, causing the prices to be inappropriately low. This was because the CCI was applied in both the Pricing Formula and the Coefficient Formula. On April 18, 2013, Restoration submitted what it called a request for an equitable adjustment to the contract that would ensure the CCI was applied only once.[4] (App. resp., ex. G).

In May 2013, the government held discussions with the offerors in the competitive range (R4, tabs 15, 18). The government identified concerns with the way Restoration had calculated its coefficient (R4, tab 18). The government allowed Restoration and the other offerors to revise their proposals, including their proposed coefficients (R4, tab 19). Restoration did not revise its coefficient.

Restoration was awarded the Contract on July 3, 2013 (R4, tab 21). As set forth in the RFP, the Contract provided that prices would be calculated using the Pricing Formula (*id*. at 9). In accordance with Restoration's proposal, the standard coefficient was .98 (*id*.).

The coefficient was used in the pricing of all 17 of the task orders eventually awarded to Restoration. There is no dispute that Restoration received at least one payment from the government under each of the task orders before January 12, 2016.

Restoration contends that the government breached the contract when it priced the task orders using a formula that double-counted the CCI (compl. ¶ 95(a)). This claim accrued no later than when the government first paid Restoration using pricing that Restoration considered incorrect — *i.e.,* when Restoration was paid less than it should have been paid because the pricing was based on the double-counting of the CCI. By that time, all events fixing the alleged liability of the government were known and some injury had occurred. The undisputed facts demonstrate that, for each

---

[4] Restoration's position was that it had already effectively been awarded the contract, even though no formal award had yet been made.

task order, this occurred before January 12, 2016.[5]  Therefore, Restoration's claim relating to the pricing coefficient accrued before January 12, 2022.

## C. Restoration Withdrew its Claim for Costs Incurred for Additional Subcontractors

Restoration claimed that the government wrongfully forced it to hire additional subcontractors to complete the remaining work following Restoration's termination of its subcontractor, ResCon, resulting in an extra $59,033.61 in expenses (compl. ¶ 95(b)).  During briefing on the government's motion for summary judgment, Restoration withdrew this claim (app. resp. at 41).  Accordingly, the claim is dismissed.

## D. The Claim for Lost Profits for Unexercised Option Years Accrued Before January 12, 2016

This claim alleges that the government wrongfully decided not to exercise the Contract's four option years, causing lost profits of $2,880,000 (compl. ¶ 95(c)).  Restoration contends that the government's decision not to exercise the first option year was made in bad faith or was arbitrary and capricious and thus breached the implied duty of good faith and fair dealing (app. resp. at 42-44).

The government provided Restoration with a copy of a Notice of Intent to Award the first option year of the contract, dated March 26, 2014 (app. supp. R4, tab 15).  Several government personnel participated in the decision to issue the letter with the notice of intent (app. resp., ex. C at 12).  Sometime between March 26, 2014 and May 27, 2014, the decision was reversed and the government decided not to exercise the option.  Robert Hood, on advice from the contracting officer Barbara Powell, made the decision.  (*Id.*)  On May 27, 2014, Restoration was informed that the government had decided not to exercise the option to extend the Contract (R4, tab 383).

On June 10, 2014, Ward called Hood, indicating that he believed that government personnel were guilty of misconduct that may rise to the level of violations of law (app. supp. R4, tabs 297-298).  Ward was advised to bring his allegations to Kathy Edenborough, the Director of Business Operations for the 628th

---

[5] Restoration also argues that this claim is not time-barred because the government allegedly advanced a "new formula" in its motion for summary judgment, which was served on Restoration on February 17, 2023 (app. resp. at 40-41). The government's arguments in its motion, however, do not change the fact that Restoration knew that, in its view, the government was applying the coefficient incorrectly at the time each task order was issued.

Contracting Squadron (*id.*). On June 12, 2014, Ward emailed Edenborough to request a meeting to discuss "allegations of misconduct in the departments that have been handling our contract" (app. supp. R4, tab 299).

On June 13, 2014, Ward met with Edenborough and Lt Col Dale Skinner, commander of the 628th Contracting Squadron (gov't mot., exs. B, C).[6] Ward made a series of allegations about Darnell and Powell, including that Darnell, the owner of ResCon, was colluding with and bribing Powell; Darnell was complaining about non-payment and trying to ruin Restoration's performance on the Contract because Restoration had decided to no longer use ResCon as a subcontractor; and Darnell and Powell were working to get rid of Restoration so that a new contract could be given to ResCon (*id.*).[7]

In a July 16, 2014, email to the government, Ward alleged that Powell "is on a Witch Hunt and is not going to stop trying to discredit Restoration Specialists [sic] reputation. I need intervention immediately as I feel Barbara is abusing her authority" (app. supp. R4, tab 312).

In a letter to Hood sent in March 2015, Ward objected to the government's decision to reverse course with regard to exercising the first option year (app. resp., ex. L; tr. 59; R4, tab 386). Among other things, Ward stated "Restoration Specialists

---

[6] Restoration contends that exhibits B and C to the government's motion, which are Air Force investigative records that include memoranda for the record by the government officials to whom Ward made allegations of misconduct by Powell and Darnell in June 2014, should not be considered because they are unauthenticated and hearsay. Our rules permit the admission of evidence "under the Federal Rules of Evidence or in the sound discretion of the presiding Administrative Judge or examiner." Board Rule 10(c); *see Laguna Constr. Co.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748 at 174,949. Restoration has not provided any reason to doubt the authenticity of the documents or to question the accuracy of the statements therein attributed to Ward. Ward's affidavit submitted in opposition to the government's motion does not contest the accuracy of the documents or offer a contrary description of the statements he made in these meetings. Accordingly, we find that these documents are appropriately considered. In any event, exhibits B and C are cumulative of other undisputed evidence that Ward believed in June and July 2014, that the government's failure to exercise the first option year of the contract was in bad faith. (*E.g.*, app. supp. R4, tab 312; app. resp., ex. L. *See also* app. resp. at 27).

[7] Restoration does not dispute the government's evidence that Ward made these statements at the meeting (*see* app. resp. at 26-27). It purports to dispute the accuracy of some of the statements, but cites either no evidence at all or evidence that does not support its assertions (*id.*).

13

firmly believes that the reversal of the position of the 628th concerning the first option year was a breach of the government's duty of good faith and fair dealing by Mrs. Powell, and that accordingly Restoration Specialists has been damaged as a result of that action and others of Mrs. Powell and the 628th" (app. resp., ex. L).

Ward's allegations spurred a government investigation that eventually resulted in the indictments and guilty pleas of Darnell and Powell (app. supp. R4, tabs 318-319; compl. ¶¶ 67, 69; gov't mot. at 13, 14).

On these undisputed facts, Restoration's claim that the government's decision not to exercise the first option year of the Contract was made in bad faith accrued before January 12, 2016. Restoration learned of the government's decision not to exercise the option on May 27, 2014. By no later than June 2014, when Ward was accusing Powell and Darnell of collusion against him and specifically alleging in writing that the option decision was a breach of good faith and fair dealing, Restoration was aware of the basis for its claim that the decision was made in bad faith. Restoration had also suffered some injury by that time, as it knew then that it would suffer the lost profits resulting from the decision not to exercise the option. Accordingly, Restoration's claim accrued well before January 12, 2016.

Restoration also argues that it was damaged by the government's failure to exercise the second, third and fourth option years in 2016, 2017 and 2018, and that, at least as to the third and fourth option years, those claims accrued after January 12, 2016, and are therefore timely. This argument fails because those claims are all dependent upon a determination that the first option year was wrongfully withheld. If the decision not to exercise the first option year stands, then the Contract properly ended in January 2016 and there were no further options to exercise. *See Fluor Federal Solutions, Inc.*, ASBCA No. 62343, 23-1 ¶ BCA 38,302 at 185,956 ("As a result of the government's failure to properly exercise the option year, the contract expired.") Because Restoration's challenge to the decision on the first option year is untimely, it has no viable claim for wrongful failure to exercise the subsequent option years.

Restoration also argues that its claims for the second, third and fourth option years survive under the "continuing claim" doctrine. Under that doctrine, portions of a claim within the statutory limitation period can survive even though the limitations period has elapsed for earlier events. *Brown Park Ests.–Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1456 (Fed. Cir. 1997). It applies only when the claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Id.* Where the claim is "based upon a single distinct event, which may have continued ill effects later on, [it] is not a continuing claim." *Id.; Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,476-77. Restoration does not identify any distinct event on which it

bases its claims for the subsequent option years. Because Restoration's claims relating to the second, third and fourth option years all stem from a single event—the allegedly bad faith decision not to exercise the first option year—the claim is not a continuing claim.

*DynCorp Int'l, LLC*, ASBCA No. 56078, 09-2 BCA ¶ 34,290, is of no help to Restoration. There, the contractor claimed that it had made obvious mistakes in its price proposal for the contract and sought recovery of the correct amounts through the base year and nine option years, even though the government had exercised only one option year. The Board declined to find that the claim as to the base year was time-barred without the development of additional evidence. As to the option years, the Board found that the continuing claim doctrine applied to the claim relating to the one option year that had been exercised, but that the contractor had no claim for the option years that had not been exercised. *Id.* at 169,407. The decision therefore does not support Restoration's position that its claims relating to the unexercised options are timely under the continuing claim doctrine.[8]

### E. The Claims for Extended Overhead (Manpower and Direct Costs) Accrued Before January 12, 2016

Restoration contends that the government caused delays to the work and directed Restoration to continue working under the Contract until January 19, 2016. It alleges that the actions and omissions of the government that required Restoration to continue working until that date caused it to incur the cost of providing an additional superintendent and safety manager from March 2014 to January 2016, as well as additional staffing overhead, resulting in increased costs of $925,696.45. (Compl. ¶ 95(d)). Restoration further claims that the government engaged in improper actions and omissions, breaches, bad faith actions and criminal activities that caused Restoration to incur additional direct costs of $40,227.75 through January 19, 2016 (*id.* ¶ 95(e)).

These claims are based upon delays and extra costs allegedly caused by the government during the course of the contract work. There is no dispute that each of the wrongful acts and omissions allegedly committed by the government that caused delay occurred before January 12, 2016. (*See* app. resp. at 20-24, 26, 28, 30-32 (describing government's alleged wrongful actions and citing dozens of

---

[8] Restoration's reliance on *Hi-Shear Tech. Corp. v. United States,* 53 Fed. Cl. 420 (2002), is also misplaced. There, the court found that, absent bad faith, the contractor could not recover for option years not exercised by the government. It did not address the accrual date of a claim for a bad faith decision not to exercise an option. Moreover, decisions by the Court of Federal Claims are not binding upon us.

15

project documents, none of which are dated, or reference activity that could have occurred, after January 12, 2016); tr. 63). Nor is there any dispute that, at the time each of the events took place, Restoration was aware that they had occurred, that the government was at fault, and that Restoration would incur or was incurring additional costs as a result. Accordingly, these claims accrued before January 12, 2016.

### F. Restoration's Claim for Interest/Fees for Money Borrowed Accrued Before January 12, 2016

Here, Restoration argues that the government failed to timely process progress payments and improperly withheld liquidated damages, forcing Restoration to borrow money to fund the work, resulting in interest and fees of $200,250 (compl. ¶ 95(f)). The undisputed evidence indicates that Restoration entered into the relevant loan agreement on or about October 22, 2014 (app. supp. R4, tab 315). It is undisputed that the events giving rise to Restoration's need to borrow funds had occurred before that date. Restoration having obligated itself to pay the interest it now claims as damages, some injury had occurred. Accordingly, this claim accrued before January 12, 2016.[9]

### G. The Claim that the Government Improperly Imposed Task Order Prices on Restoration Accrued Before January 12, 2016

In this claim, Restoration asserts that, in awarding task orders, the government imposed cost estimates on it rather than using the pricing method set forth by the contract, resulting in a discrepancy of $614,459.39 (compl. ¶ 95(g)). Restoration does not dispute that it was aware of the government's allegedly wrongful actions in connection with pricing the task orders at the time each task order was issued. There is also no dispute that all of the task orders and modifications thereto were issued well before January 12, 2016 (tr. 78). Restoration suffered some injury when each of the task orders was issued with allegedly incorrect pricing. Accordingly, this claim accrued before January 12, 2016.

### H. The Claim for Lost Profit on Deleted Work on Task Order 14 Accrued before January 12, 2016

Restoration claims that the government canceled Task Order 14 before the work was complete and paid Restoration only for actual work performed, resulting in lost profits of $11,287.40 (compl. ¶ 95(h)). The modification deleting the remaining Task Order 14 work was issued on June 18, 2015 (R4, tab 244). At that time, Restoration

---

[9] We find it unnecessary to address the government's argument that this claim fails on the merits because the claimed interest is not recoverable.

was aware of the basis for its claim and that it would suffer the injury (lost profits) it alleges (*see* tr. 67).  Accordingly, the claim accrued before January 12, 2016.

**I.  The Claim for Lost Profits for Unawarded Task Order 18 Accrued Before January 12, 2016**

This claim contends that the government failed to award Task Order 18 to Restoration, despite negotiating Task Order 18 and directing Restoration to add an additional safety manager and superintendent in anticipation of the award, resulting in lost profits of $43,208.35 (compl. ¶ 95(i)).  It is undisputed that the government could no longer issue task orders when the base period of the contract ended on July 2, 2014 (tr. 62-63).  Therefore, Restoration was aware as of that date that Task Order 18 would not be awarded and that it would suffer the lost profit that forms the basis of its claim.  Accordingly, this claim accrued before January 12, 2016.

**J.  The Claim that the Government Wrongfully Withheld Modifications to Task Order 5 Accrued Before January 12, 2016**

In this claim, Restoration asserts that the government refused to process a change order to Task Order 5, resulting in damages of $10,644.74 (compl. ¶ 95(j)).  Restoration contends:

> [T]he government required a permanent eye wash station rather than a portable one (which required additional plumbing work) and deleted fans, louvers and ductwork, etc. related to new exhaust fans. (App. R4, tab 30). Despite that the two estimates submitted by Appellant resulted in an additive cost (App. R4, tabs 39 and 40), the government wrongfully issued a deductive change for this work. (R4, tab 92).

(App. resp. at 29).  The estimates Restoration refers to appear to date from May and July 2014 (app. supp. R4, tabs 30, 40) and the document Restoration cites as the wrongful deductive change was executed by the contracting officer on October 9, 2014 (R4, tab 92).  In any event, it is undisputed that Restoration had completed the work required by Task Order 5, and the government had accepted the work, by November 24, 2014 (app. supp. R4, tab 190).  At this point, Restoration knew or should have known that the government would not be issuing any further change orders to change the pricing to cover the alleged costs and thus was aware of the basis for any claim arising out of the failure to do so.  By that time, the events fixing liability had occurred and Restoration had suffered some injury.  Accordingly, this claim accrued before January 12, 2016.

**K. The Claim that the Government Wrongfully Withheld a Modification to Task Order 13 Accrued before January 12, 2016**

Restoration claims that the government refused to process a change order to Task Order 13 relating to security grade lighting upgrades, resulting in damages of $24,880.54 (compl. ¶ 95(k)). Restoration contends that. "[d]espite that non-security grade lighting fixtures were included in the negotiation for replacement fixtures in DO 13, the government required Appellant to install security grade fixtures and refused to issue a modification for this increase in costs. (App. R4, tab 96)." (App. resp. at 31). The document Restoration cites in support appears to date from June 2014 (app. supp. R4, tab 96). As with Task Order 5, Restoration completed work on Task Order 13 long before January 12, 2016 (gov't mot., ex. D). Specifically, Restoration submitted a progress report dated February 28, 2015, stating that the work on Task Order 13 was complete, and the government signed the progress report on June 23, 2015. (*id.*). By this date, Restoration knew or should have known of any claims arising from the government's failure to increase the price to account for the lighting upgrades per Restoration's proposal from a year earlier. Accordingly, this claim accrued before January 12, 2016.

**L. Material Issues of Fact Exist Regarding the Accrual of the Claim for Funds Remaining on the Contract**

Restoration also seeks payment of $49,350.01 in funds that remained on the Contract when Restoration submitted its claim to the contracting officer on January 12, 2022 (R4, tab 387 at 16). The contracting officer's final decision granted this aspect of Restoration's claim but the government has not paid it. The government now contends that this claim is mostly time-barred.

The government is not bound by the contracting officer's decision to grant the claim, because Restoration's appeal to the Board renders that decision a nullity and we review the claims *de novo. See Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994); *Assurance Co. v. United States*, 813 F.2d 1202, 1207 (Fed. Cir. 1987); *Innovative Techs., Inc.* ASBCA Nos. 61686, 62185, 23-1 BCA ¶ 38,413 at 186,658. Accordingly, if the government meets its burden to show that the claim is barred by the statute of limitations, Restoration is not entitled to payment.

The government contends that Restoration's claim for payment for work on a given task order accrued no later than its completion of work on that task order. Restoration does not dispute that all contract work was completed by June 18, 2015, except for the work on Task Order 2 (gov't mot. at 12-13 ¶¶ 19, 21, ex. F; app. resp. at 28-30 ¶¶ 19, 21). The government argues that, therefore, Restoration's claims for payment on the task orders other than Task Order 2 necessarily arose before

January 12, 2016. The government concedes that the work on Task Order 2 was not completed by January 12, 2016, and that Restoration is therefore entitled to $1,141.17, the amount remaining on that task order (gov't mot. at 29-30).

The government has not met its burden to show that the remainder of the claim is time-barred. It is undisputed that the reason the funds in question had not been paid was that Restoration had not yet submitted invoices for that work (tr. 26). Completion of work in accordance with the contract entitled Restoration to submit an invoice for that work (R4, tab 21 at 16; FAR 32.905 ("Payment will be based on receipt of a proper invoice and satisfactory contract performance."). An invoice is a "routine request for payment," which is not a CDA claim when it is not in dispute. FAR 2.101 (definition of "claim"). On the current record, as of January 12, 2016, Restoration had not yet invoiced for the funds and the government had not disputed Restoration's entitlement to the funds. Construing the facts in Restoration's favor as we must, the government has not established that Restoration had suffered any injury as of January 12, 2016, giving rise to a claim against the government. *See Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964) ("[W]here a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongly withheld in breach of the contract."). As a result, the government has not shown that a claim for non-payment accrued more than six years before Restoration submitted its claim on January 12, 2022.

Accordingly, material issues of fact preclude summary judgment for the government on this claim.

V.     **Equitable Tolling**

Restoration argues that, even if its claims accrued more than six years before it submitted them to the contracting officer, the government is nonetheless not entitled to summary judgment because there are material issues of fact as to whether the claims survive under the doctrine of equitable tolling.

The CDA's statute of limitations is subject to equitable tolling. *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1322 (Fed. Cir. 2014); *Beechcraft Def. Co., LLC; Textron Aviation Inc.; & Textron Aviation Def., LLC*, ASBCA No. 61743 *et al.*, 23-1 BCA ¶ 38,283 at 185,884. "[E]quitable tolling against the federal government is a narrow doctrine." *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003). Equitable tolling is appropriate "when a litigant has (1) been pursuing his rights diligently, and (2) some extraordinary circumstance 'stood in his way and prevented timely filing.'" *Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 22-1 BCA ¶ 38,074 at 184,906 (quoting *The Adamant Grp. for Contracting and Gen. Trading*, ASBCA No. 60316, 16-1 BCA ¶ 36,577 at 178,136); *see also*

19

*Menominee Indian Tribe of Wis. v. United States,* 577 U.S. 250, 255 (2016); *Kamaludin Slyman CSC*, ASBCA No. 62006 *et al.*, 21-1 BCA ¶ 37,849 at 183,794. "[M]ere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as 'where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)). The party seeking equitable tolling bears the burden of making the necessary showing. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Superior Constr. Co.*, ASBCA No. 61468, 20-1 BCA ¶ 37,640 at 182,759.

Restoration argues that "[t]he extraordinary circumstances of the criminal investigation impeded and delayed Appellant from knowing or being able to know of all events that fix the government's liability . . . ." (app. resp. at 60). Yet Restoration has not identified any information relevant to the accrual of its claims that it was unable to learn as a result of the criminal investigation. To the contrary, when Restoration submitted its claim on January 12, 2022, it relied overwhelmingly on information that it knew as of January 12, 2016, including the fact that Darnell and Powell were conspiring against it.

At oral argument, Restoration's counsel argued that Restoration did not file its claim earlier because Ward, too, was a subject of the criminal investigation and therefore "treaded very lightly" (tr. 10-11). There is no evidence in the record to support this argument. Ward submitted an affidavit in response to the government's motion, but surprisingly that affidavit says nothing at all about why his company did not submit its claim until January 12, 2022, much less support counsel's argument that he delayed because of the government's investigation. Nor does the affidavit provide any information suggesting that he acted diligently in support of his contract rights while the years ticked by. We find that Restoration has not made even a minimal showing that it will be able to establish the existence of either of the two required elements for equitable tolling. Because Restoration has failed to make a showing sufficient to establish the existence of the essential elements of equitable tolling, on which it bears the burden of proof at trial, summary judgment against it is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). While Restoration claims to need discovery, as we explained above it has not shown that it lacks information presumably in its possession (*i.e.*, why it delayed and how it was diligent) or how discovery might bring necessary information to light.

Even if there were any evidence that Restoration delayed filing the claim because Ward was under government investigation, that alone would not be sufficient to establish the required extraordinary circumstance. While one might imagine scenarios in which a government investigation could be found to present the required extraordinary circumstance preventing the filing of a claim despite the contractor's

diligence, no such showing has been made here.  At most, counsel suggests that it would have been *imprudent* for Ward to have his company submit a claim—being under investigation, Ward needed to "tread lightly"—but that is significantly different from showing that the existence of the investigation prevented the submission of the claim, or that the government engaged in trickery or other misconduct that induced Restoration to allow the deadlines to pass.  *See Afghan Premier Logistics*, 23-1 BCA ¶ 38,373 at 186,403.  We find that Restoration has failed to meet its burden as the nonmovant to present "sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant."  *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

<u>CONCLUSION</u>

Appellant's claim for costs incurred for additional subcontractors, which was withdrawn, is dismissed.  The government's motion for summary judgment is granted as to all of appellant's remaining claims, except for its claim for $49,350.01 in funds that remained on the Contract.  As to that claim, the motion for summary judgment is denied.

Dated:  November 14, 2023

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

21

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63284, Appeal of Restoration Specialists, LLC, rendered in conformance with the Board's Charter.

Dated:  November 15, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals